178 So. 69

## GRIMES v. STATE.
### 6 Div. 145.

Court of Appeals of Alabama.
June 29, 1937.

Rehearing Denied Oct. 5, 1937.

Foster, Rice & Foster, of Tuscaloosa, for appellant.

W. H. Mitchell, of Florence, amicus curiæ.

A. A. Carmichael, Atty. Gen., and Wm. H. Loeb, Asst. Atty. Gen., for the State.

RICE, Judge.

### Statement of Facts

The appellant was indicted for and convicted of conducting a lottery and fined $200.

The evidence on behalf of the State tended to show that within twelve months before the finding of the indictment appellant was city manager of the moving picture theaters located in Tuscaloosa, Ala., being employed as such by the Alabama Theatres, Inc., and that one Whitney Echols was the house manager of the Ritz, working under the direction of the defendant, and that during the period of time within twelve months before the return of the indictment there had been conducted at the Ritz Theatre a plan or enterprise referred to in the testimony as "Jack Pot Night," and that the plan of the "Jack Pot" was as follows:

The "Jack Pot Night" was held each Thursday night at the Ritz Theatre, in Tuscaloosa, Ala. A registration booth was maintained during all hours of each day of the week in the marquee of the theater, where registration cards could be signed, which cards were in words and figures as follows:

"Jack Pot Filing Card
Ritz and Diamond Theatres, Tuscaloosa, Ala.

Name: ————

Address: ————

Jack Pot Nights Are Held Each Thursday Night At 8:45 or Such Other Night as Advertised

"If the person whose name is drawn isn't present or has not registered during the matinee on above date, the weekly prize will be added to the Jack Pot each week until there is a winner. Only one name will be drawn each Jack Pot Night.

"I definitely understand the above rules and unless I am present at the drawing or have registered during the matinee on above day, I relinquish all claims to the Jack Pot.

Copyright 1935 Signed————

Foreman A. Rogers
Auburn, Ala."

And all people generally in Tuscaloosa, Ala., and vicinity, were permitted, if they so desired, to sign such a card, and a permanent alphabetical record was kept by the Ritz Theatre of the names of those signing such card, and no one was permitted to sign such card except once, and no charge of any kind was made or any consideration exacted from any one, and the signing of such card was absolutely free, no one being required to purchase a ticket of admission to register. On a stub of the card, divided from the body of the same by perforation, was this legend:

"Jack Pot Night
Deposit This Stub In Hopper
Name: ————
Address: ————
Drawing Stub."

At time of "registering" this stub was torn off from the body of the card and deposited in a container known as a "hopper," and on each Thursday night the hopper was placed upon the stage of the Ritz Theatre and some disinterested person was blindfolded and drew one of the stubs from the hopper, and if the person whose name was drawn from the hopper claimed the prize within two minutes, such person was given the prize known as "Jack Pot." The right to claim this prize was not limited to those who had paid an admission price to see a performance or the picture immediately prior to the drawing, but any one could claim the prize within two minutes, whether they had paid to attend a performance of the theater or not, or whether they were in attendance at the theater at the time of the drawing or not, and if they were not in the theater and did not have a ticket of admission and their name was drawn from the hopper, such person was entitled to enter the theater, without purchasing a ticket, claim the prize and leave the theater. The name drawn was called out in the theater and on outside of theater. That the foregoing phases of the scheme was given publicity by advertisements on the screen of the theater, and by "word of mouth" publicity given by the house manager of the theater, Mr. Echols, is undisputed. Some 4,000 people residing in Tuscaloosa, Ala., and vicinity, had signed such cards and had caused their names to be placed in the hopper, without any charge being made for the same. This drawing had been conducted each Thursday night for a period of about eighteen months prior to the returning of the indictment against the defendant.

In addition to the original registration card, those patrons of the theater who attended a performance of the theater prior to the hour of the drawing on the day of the drawing, viz., Thursday of each week, were permitted, if they so desired, to sign an additional card other than the registration card, which additional card was referred to in the testimony as "Matinee Registration Card," which matinee registration card was in words and figures as follows:

"Matinee Registration Card for Jack Pot Night
This is to Certify that I have attended the Matinee at the Ritz or Diamond today ————
Mr., Mrs., Miss No. 66357
—————————————————————
First Name Middle Name Last Name
Street Address: ————————————
Town: ————————————————
This Portion For Theatre Files."

And on a "stub" of the card, separated from the above quoted portion by perforation, was this legend:

"Patron's Receipt.—Keep this receipt and present same if your name is drawn.
"This is to Certify that the
No. 66357 Patron whose name appears on the detached portion of this card attend the Ritz or Diamond.
Today —————
Signed —————
For the Theatre."

which stub was given to the patron. If a person who had attended a performance of the theater on the day of the drawing and certified to the attendance by signing one of these cards and who had at any time previously registered so that the name was in the hopper and such person's name was drawn from the hopper on that day, then such person was exempted from claiming the prize within two minutes after the name being drawn, but could claim the prize at anytime thereafter. No charge was made for the "Matinee Card," and signing matinee card did not increase number of times name was placed in hopper, as name was only placed in hopper once, which was at the time of the free original registration. The prize was in the form of money, being a minimum of $50. If the person whose name was drawn from the hopper on a given Thursday failed to claim the prize within two minutes, or if the person whose name was drawn had not attended a performance on the day of the drawing and had signed the "Matinee Registration Card" so certifying his attendance, then the prize was not paid to any one, but an additional $25 was added at each drawing thereafter to the original amount of $50, and subsequent drawings held each Thursday night thereafter until some one whose name had been drawn claimed the prize, in one of the manners provided for. When some one claimed

the prize, then a new drawing was started, and so on until the jack pot was discontinued on commencement of this prosecution. The evidence on behalf of the State further tended to show that while the foregoing plan of operation was the one prescribed by the defendant to the House Manager, Whitney Echols, the plan was deviated from in the following manner:

Several witnesses were permitted to testify that they had attended a performance at the theater on a day of the drawing and had purchased tickets for others who had not accompanied them to the theatre, and had signed such other person's name to the matinee registration card, and that one person had won one of the "Jack Pots" without attending the theater, his name certifying his attendance having been signed to the matinee card by his niece at the time she attended the theater, and the house manager, relying on the certificate, paid the claim.

The evidence on behalf of the defendant tended to show that neither the defendant nor the house manager, Whitney Echols, had any actual knowledge that any one was signing the matinee registration cards without actually attending a performance of the theater on the day of the drawing, and that so far as they knew the plan of operation, as hereinabove detailed, was actually carried out, and none of the witnesses testifying to having signed the names of others to registration cards called this fact to the attention of the defendant or the house manager, nor was such done in the presence of the defendant; nor in the presence of any of the Alabama Theatre, Inc.'s employees, in such a manner that it would come to their attention that names of persons not attending the theatre were being signed to the matinee cards. There was no evidence of any kind tending to show that this defendant had actual knowledge of any deviation from the plan, and the only evidence that the plan had been deviated from was the testimony of five of the 4,000 persons participating in the drawings.

The evidence on behalf of the defendant further showed that each of the witnesses testifying that they had signed the names of others to matinee cards, further testified that on some Thursdays such other persons would attend the performance of the theater in the company of the witness and on some Thursdays such other persons would not, and that there was no manner by which the defendant, or any one of the defendant's employees, could know that they had signed the names of other persons to the card, or that such other persons had not attended a performance of the theater on the day of the drawing, as provided for by the plan and certified to on the matinee registration cards.

### Opinion.

All that appears hereinabove is taken from the brief filed here on behalf of appellant. It seemed advisable to thus burden with length our opinion because of the importance of the question presented by the appeal; and because of the almost innumerable "variations" of the schemes adopted by the large number of motion picture shows throughout the land, whose "plans" have reached the higher courts for analysis —all said "plans," as appears, having in view the "getting outside the ban" of lottery laws not dissimilar to our own.

 In this case the trial judge charged the jury, among other things, orally, as follows: "It is a violation of the laws of Alabama for anyone to set up and operate a lottery or any scheme or gift enterprise in the nature of a lottery, no matter by what name it may be called. In order to constitute a lottery, it is necessary; first, to have a prize offered. It is conceded in this case that a prize was offered, a gift or prize paid. In the next place, it is necessary that the person who wins that prize shall be determined by chance; and that was also conceded in this case, that this prize was distributed by chance, by putting names into the hopper and someone drew them out, and the one whose name was called got the prize under certain conditions,—that that was a chance. The next thing that is necessary to constitute a lottery is that there should be a consideration paid. It is not a violation of the law for a man to give a prize, if he does not charge any consideration for it, but if there is a consideration paid and if the prize is set up and awarded by chance, then it is a lottery or a scheme in the nature of a lottery. So, the real question in the contest in this case is whether or not there was a consideration paid in order to get a chance in this prize or in this jack pot as it has been called."

We approve the quoted excerpt. Yellow-Stone Kit v. State, 88 Ala. 196, 7 So. 338, 7 L.R.A. 599, 16 Am.St.Rep. 38. For we do not find that article 4, § 26, of the Constitution of 1875 and sections 4068 and

4069 of the Code of 1886, under which the holding by our Supreme Court in the said Yellow-Stone Kit Case was made, declared the law in any material respect differently from section 65 of the Constitution of 1901 and section 4247 of the Code of 1928, under which appellant now stands convicted.

So we will endeavor to analyze the "plan" used by appellant to see whether or not a consideration had to be paid by one seeking a "chance" at the "prize" offered.

The temptation is strong to enter upon a discussion of the large number of cases cited to us by counsel for the State, for the appellant, and the counsel appearing amicus curiæ, but we cannot see the necessity. After all, the law being clear, it is merely our duty to apply it to the facts here shown without dispute.

As we see it, appellant, by his own testimony, convicts himself. While he claims that "all and sundry" may have a chance at the prize, without money and without price, yet his said testimony reveals that all that considerable portion of the picture show's patrons who do not expect to be present at—or within "two minutes distance of," to so denominate it—the drawing, must pay for their chance, if they get it, the price of a matinee ticket. True, they get a matinee ticket with this chance; but the price of the ticket is nevertheless paid for the chance, plus the ticket, or for the ticket, plus the chance. Which, we think is immaterial. People of State of New York v. Miller, 271 N.Y. 44, 2 N.E.2d 38; City of Wink v. Griffith Amusement Co., Tex.Sup., 100 S.W.2d 695.

What we are trying to say may be illustrated this way: Here's a patron of the picture show—or one who has registered and gotten his name into the "hopper," free, regardless of whether or not he is a patron of the picture show—who is not going to be present or, to again use our expression, "within two minutes distance," at the time of the drawing. Such an one has no chance at the prize, admittedly. Now, says appellant: "Pay for a matinee ticket (the fact that a few might go on "passes" would not affect it) and get a chance! Scores, doubtless, would do that very thing. Did do it.

The reason we speak so positively of "one who is not going to be present," or within "two minutes distance" is that every one who registers at the matinee says by his act just that—else the "registering" would be unnecessary.

So the scheme falls under the ban of our laws.

We have not paid attention to the argument about the "deviation" from the plan, because it seemed to us unimportant. Of course appellant could not tell whether or not one who purchased a matinee ticket expected to, and did, attend the showing of the matinee picture. We do not think it mattered.

But if it did, of course it was arranged so that one did not have to actually "sit through the show." The "certificate" was signed before the show began! And all the testimony shows that the patron—or pretended patron—was allowed, uniformly, to sign "For the Theatre" certifying that said patron "attend (sic) the Ritz or Diamond" —whatever that means.

Appellant cannot be heard to claim that he did not know, personally, just what everybody could see would be the actual way the "plan" would operate—he all the time "paying off" at his office.

We have no occasion to consider what would be the legal status of appellant's "plan" without the "matinee registration" feature. But we do not want to be understood as intimating that it would then be beyond the reach of the law.

Now a word as to the holding by our Supreme Court in the Yellow-Stone Kit Case: Beyond defining what constitutes a lottery we cannot see that it has any bearing upon the question raised by the present appeal. There, the "chances" dealt out were really and in truth free "chances." A man holding one could win whether or not he was present. Here, of course he could not— unless he paid.

The judgment is affirmed.

Affirmed.