ESTEBAN SERRA y ELISA PÉREZ DE SERRA, demandantes y apelados, *v.* SALESIAN SOCIETY y REV. PADRE JUAN RIU, demandados y apelantes.

*Número:* 12454. *Resuelto:* 29 de diciembre de 1961

---

*Edelmiro Soldevila,* abogado de los apelantes, *Gilberto Ramírez Velasco* y *Guillermo Bauzá,* abogados de los apelados.

Sala integrada por el Juez Asociado señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados señores Rigau y Dávila.

El Juez Asociado Señor Rigau emitió la opinión del Tribunal.

En esta acción se solicita de los tribunales que utilicemos la maquinaria coercitiva del Estado para poner en vigor un contrato ilícito.

Se justifica examinar con precisión los hechos del caso; luego consideraremos el derecho aplicable. En el mes de junio de 1954 el sacerdote Rev. Juan Riu, Superior del Oratorio San Juan Bosco, institución de la Iglesia Católica, sito en Santurce, P. R., envió por correo a la Sra. Elisa Pérez de Serra, aquí demandante, a su residencia en Guánica, P. R., una carta circular mimeografiada fechada a primero de junio de ese mismo año y un libro de diez boletos de a dólar cada uno para una rifa que se tiraría, según reza dicha carta, el 4 de julio de 1954. La mencionada carta circular, que está firmada por el Padre Riu, explica que los señores sacerdotes estaban allegando fondos para los fines religiosos del Oratorio y añade. "Para ello contamos con el éxito de una rifa, que . . . estamos decididos a tirar en julio 4."

Los premios de la rifa serían una "sortija de brillante valorada en $8,000.00", un "cuadro pintado a mano", un radio y un rosario de plata. Dichos premios corresponderían, en ese orden, a las personas que tuviesen en su poder los boletos con "los números correspondientes al primero, segundo, tercero y cuarto premios de la Lotería Extraordinaria de Puerto Rico, del día 4 de julio de 1954", según expresan los boletos.

La demandante decidió comprar los boletos pero tuvo que esperar hasta fines del mes de junio, cuando su esposo

cobraría su sueldo, para poder enviarle los $10.00, importe de los boletos, al Padre Riu a San Juan. Llegó el cheque del esposo, se cambió el mismo y el día dos de julio la demandante fue a Yauco para enviar el dinero a San Juan con una persona conocida de ella. Esta persona era el señor William Oliveras, condueño de una línea de carros públicos que viajaban diariamente de Yauco a San Juan. Oliveras guardó el dinero en su escritorio con el propósito de llevarlo al otro día, día tres de julio, a San Juan, al Padre Riu. Tenía para esa fecha Oliveras un familiar muy enfermo en Ponce, el cual murió y con ese motivo a Oliveras se le olvidó el encargo de la Sra. Serra. El dinero se quedó guardado en su escritorio en Yauco.

Se tiró la lotería el día 4; se enteró doña Elisa que su boleto era el ganador del brillante de $8,000.00, pero también se enteró de que a Oliveras se le había olvidado hacer llegar el dinero al Padre. Para demostrar al Padre que ella había entregado el dinero a Oliveras el día dos de julio, antes de tirarse la rifa y no después, doña Elisa Serra se personó en el Oratorio en Santurce, acompañada del propio Oliveras. Le explicaron lo sucedido al Padre Riu y le hicieron entrega de los $10.00 en pago de los boletos, dinero que el Padre aceptó. En esa ocasión el Padre le dijo a la demandante que le entregaría el brillante, pero que no lo tenía allí en el Oratorio sinó en un banco en San Juan; que pasados dos días se lo entregaría. Se quedó la demandante en San Juan y transcurridos los dos días llamó al sacerdote con miras a recoger el brillante. Entonces el Padre le informó que no se lo entregaría porque el asunto estaba en manos de un abogado y de una comisión. Esa misma semana el Reverendo envió al abogado y a dos personas más a visitar a la demandante para devolverle los $10.00 y para ratificarle que no le entregarían el premio. La demandante rehusó aceptar el dinero.

Aunque renuente a "llegar a ese extremo," pero "como el Padre me dijo que él tenía un abogado," declaró la deman-

dante, ella también se buscó el suyo. Acompañada de su abogado la demandante fue a ver al Padre de nuevo. En esa entrevista el Padre le pidió "pruebas" de que ella era la ganadora. En cumplimiento de esa solicitud la demandante trajo de Yauco a San Juan, a ver al Padre, a las cuatro personas que estaban presentes en la oficina de Oliveras en Yauco el dos de julio cuando ella le entregó el dinero a Oliveras para que él lo llevase al Padre. Esas personas eran el propio William Oliveras, su secretario Pablo Mercado, y dos señoras clientes de la línea de carros de Oliveras (Ana Pérez y Adelina Santiago). Le volvieron a explicar al sacerdote lo ocurrido y le informaron que esos cuatro testigos habían hecho declaraciones juradas al efecto. También la demandante entregó al Padre Riu una carta de recomendación del párroco de Arecibo quien le había casado a ella y a su esposo hacía dieciocho años; le trajo otras cartas de recomendación y "el número del periódico" al cual nos referiremos en breve. A pesar de los testigos y de las cartas el Padre se ratificó en su decisión de no entregar el premio.

La lotería se tiró, como hemos dicho, el día 4 de julio. De la prueba surge además lo siguiente. La demandante y Oliveras le entregaron el dinero importe de los boletos al Padre Riu el siete o el ocho de julio. Con fecha de 14 de julio el Padre Riu envió a los compradores de los boletos de la rifa una carta circular mimeografiada y firmada por él, en la cual informaba sobre los ganadores de los premios. Aparece en dicha carta con el número uno, la demandante Doña Elisa Pérez de Serra, de Guánica. Además informa la carta que "fueron también obsequiados con sendos televisores" dos personas: Doña Demetria Rodríguez y el Dr. Manuel García Estrada. También el 17 de julio se publicó en el periódico "El Mundo" de San Juan una nota del Oratorio San Juan Bosco en la cual se informa sobre los ganadores de la "actividad" del 4 de julio y se menciona en primer lugar a Doña Elisa Pérez de Serra, de Guánica. También se menciona, entre otros favorecidos, al Dr. Manuel García Estrada.

En el acto del juicio el Dr. Manuel García Estrada fue uno de los testigos de los demandados. Su participación en los hechos consistió en que él fue uno de los miembros de la comisión que fue a visitar a la demandante de parte del Padre Riu para devolverle los diez dólares a ella. Luego de prestar declaración el Dr. García Estrada, en la repregunta, el abogado de la demandante le preguntó al doctor si él había recibido el televisor que según la carta circular del Padre Riu del 14 de julio él se había ganado. La respuesta del doctor fue la siguiente: "Primera noticia del televisor. Yo no he recibido ni el televisor ni el aviso del Padre Riu ni nada."

Finalmente, al fracasar todas las tentativas de persuasión de la demandante, ésta interpuso acción civil en el Tribunal Superior solicitando que se condene a los demandados a entregarle la sortija de brillante valorada en $8,000.00 o esa suma en dinero, más las costas y honorarios de abogado. Declarada con lugar la demanda por el tribunal de instancia recurren ante nos los demandados, el Padre Riu y la Sociedad Salesiana, e imputan a dicho tribunal la comisión de seis errores. A continuación transcribimos *verbatim* el primer error señalado: "El Tribunal inferior incurrió en grave y fundamental error al denegar la moción de desestimación, la moción sobre sentencia sumaria y la defensa especial alegada en la contestación, basadas todas en que el Tribunal no tiene jurisdicción para entender en este caso, ya que expresamente le está vedado por ley por razón de la materia, y en que por igual motivo la demanda no aduce hechos constitutivos de causa de acción."

En otras palabras, la cuestión planteada ante nosotros es ¿Pueden los tribunales prestarle el auxilio que solicita la demandante? ¿Sería eso compatible con nuestro deber de sostener las leyes? ¿Es ello posible en vista de la ley expresa vigente? Veamos la naturaleza del contrato celebrado entre las partes y cual es la situación de derecho respecto al mismo. ■

Las rifas, loterías y demás juegos de azar están prohibidos por ley. Sólo están permitidos algunos por vía de excepción y en estos casos la Asamblea Legislativa ha tenido razones de orden público para así hacerlo. El Artículo 291 de nuestro Código Penal dispone que:

"Se entiende por lotería, para los efectos de este código, cualquier plan para la disposición o distribución de dinero o bienes por suerte, entre personas que hayan pagado o prometido pagar cualquier precio o compensación por correr la aventura de obtener dichos objetos o parte de ellos, o cualquiera acción o interés en los mismos, en virtud de algún acuerdo, inteligencia, o esperanza de que habrán de distribuirse por suerte, *llámese lotería, rifa, empresa de regalos o por cualquier otro nombre.*" [Énfasis suplido.] 33 L.P.R.A. sec. 1211.

En el artículo siguiente (Art. 292) dispone dicho código que "Toda persona que inventare, preparare, estableciere o jugare cualquier lotería, será reo de delito menos grave." En cuanto a la venta de boletos de lotería el Código Penal expresa que:

"Todo el que vendiere, cediere, o en cualquiera forma supliere o traspasare a otro o para un tercero, algún billete, suerte, acción o interés, o algún papel, certificado o instrumento que se presumiere o entendiere ser o representar algún billete, suerte o acción, o interés en cualquiera lotería, o que dependiere del resultado de la misma, será reo de delito menos grave." Art. 293; *33 L.P.R.A. sec. 1213.*

También será reo de delito menos grave todo el que ayudare a establecer, dirigir o jugar una lotería (Art. 294) y los valores y objetos ofrecidos para su reparto en contravención de las citadas disposiciones, serán confiscados. Artículo 297; 33 L.P.R.A. secs. 1214 y 1217. ■■

No hay duda de que la rifa que motivó este caso cae dentro de los términos del citado Artículo 291 del Código Penal, el cual define la "lotería" que los subsiguientes Artículos 292 al 298 del mismo código prohiben. Comprende la rifa que aquí consideramos un "plan para la disposición o distribu-

ción" de "bienes por suerte, entre personas que hayan pagado o prometido pagar" un precio "por correr la aventura de obtener dichos objetos o parte de ellos" en virtud de un acuerdo o esperanza de que habrán de distribuirse por suerte." Además de que dicha rifa cae dentro del articulado del Código que la prohibe, concurren en ella los tres elementos que tradicionalmente han sido considerados por la jurisprudencia como esenciales para que exista la lotería o juego de azar prohibido por los estatutos. Estos tres elementos son (1) el premio, (2) el azar o suerte por medio del cual se gana el premio y (3) el pago o prestación (*"consideration"*) que se hace o se promete para tener derecho a participar en la rifa o lotería. En el caso de autos están claramente presentes esos tres elementos esenciales, los cuales expresados en ese mismo orden son (1) la sortija con diamante, (2) el azar de poseer o no el boleto con el número correspondiente al primer premio de la Lotería de Puerto Rico y (3) el dólar que se pagaba por cada boleto de la rifa. *Pueblo* v. *Swiggett*, 37 D.P.R. 911, 915 (1928).

En el mismo sentido que acabamos de expresar pueden verse los siguientes casos interpretativos del Art. 319 del Código Penal de California, artículo que es igual al Art. 291 de nuestro Código y del cual el nuestro procede. *People* v. *Postma*, 160 P.2d 221 (1945); *People* v. *González*, 144 P.2d 605 (1944); *People* v. *Babdaty*, 30 P.2d 634 (1934); *People* v. *Cardas*, 28 P.2d 99 (1934); *People* v. *Hecht*, 3 P.2d 399 (1931).

El asunto está establecido por la jurisprudencia hasta la saciedad. *F.C.C.* v. *American Broadcasting Co.*, 347 U.S. 283, 98 L. Ed. 699, 706 (1954) (J. Pres. Warren); *Homer* v. *U. S.*, 147 U.S. 449, 37 L.Ed. 237, 241 (1893); *Affiliated Enterprises* v. *Truber*, 86 F.2d 958, 959 (1959); *J. C. Martin Corp.* v. *F. T. C.*, 242 F.2d 530, 533, (1957); *U. S.* v. *83 Cases of Marchandise*, 29 F. Supp. 912, 914 (1939); *Affiliated Enterprises* v. *Rock-Ola Mfg. Corp.*, 23 F. Supp.

330

3, 5–7 (1937); *Central States Theater Corp.* v. *Patz*, 11 F. Supp. 566, 568 (1935); *State* v. *Jones*, 107 P.2d 324, 326 (1940); *Iowa* v. *Hundling*, 264 N. W. 608, 609 (1936); Anotaciones en 96 L. Ed. 312, 313–314; 113 A.L.R. 1121; 109 A.L.R. 709; 103 A.L.R. 866; 60 A.L.R. 349; 57 A.L.R. 424; y 48 A.L.R. 1116.([1])

Si en cualquier actividad coinciden los tres elementos (premio, azar y pago) que juntos constituyen el juego prohibido por la ley, la misma cae dentro de la prohibición estatutaria no importa el *nombre* que se le de o atribuya a dicha actividad (lotería, rifa, regalo, etc.). *Holmes* v. *Saunders*, 250 P.2d 269, 270 (1952); *Grimes* v. *State*, 178 So. 69 (1937), cert. denegado 178 So. 73; *State* v. *Wonk Took*, 265 P. 459 (1928); *State* v. *Danz*, 250 P. 37 (1926). Y si la actividad transgrede la ley no queda legalizada porque sus *motivos* reales o alegados sean o parezcan buenos, ya sean estos caritativos, religiosos, de promoción comercial, etc. *Fairchild* v. *Schanke*, 113 N. E.2d 159, 163 (1953); *Commonwealth* v. *Malco-Memphis Theatres*, 169 S.W.2d 596 (1943); *People* v. *Kiefer*, 16 N.Y. S.2d 858 (1940) *State ex rel Trampe* v. *Multerer*, 289 N.W. 600 (1940); *Harriman Institute* v. *Carrie*, 84 P.2d 1088 (1938). Tampoco es necesario que resulte ganancia o lucro. *Pueblo* v. *Martínez*, 23 D.P.R. 228, 230 (1915). Ni es relevante que la "lotería" prohibida se jugase en combinación con la de Puerto Rico o con la de otro país. *Pueblo* v. *Sierra*, 49 D.P.R. 510, 513 (1936).

Resultando del anterior análisis que en este caso se trata de una rifa o lotería prohibida por la ley, nos resta ver cual es la situación de los litigantes ante el Derecho.

---

([1]) No es necesario continuar la cita de autoridades al respecto. En 54 *C.J.S.*, *"Lotteries"*, sec, 2, escolio 14, puede verse citas de abundante jurisprudencia resolviendo en el mismo sentido que la anteriormente citada, procedente de Ala., Ariz., Cal., Conn., Del., D.C., Pla., Ga., Iowa, Mass., Mich., Minn., Miss., Mo., Mont., Neb., N.H., N.Y., Okl., Or,. Pa., R.I., S.C., Tenn., Tex., Wash., W.Va., y Wis.

Comienza nuestro Código Civil con unas disposiciones preliminares que porque se presumen tan conocidas suelen a veces olvidarse. A manera de introducción a lo que más adelante vamos a decir conviene que expresemos aquellos de esos principios que son pertinentes a este caso: La ignorancia de las leyes no excusa de su cumplimiento; son nulos los actos ejecutados contra lo dispuesto en la ley; las leyes sólo se derogan por otras leyes posteriores y no prevalecerá contra su observancia el desuso, la costumbre, o la práctica en contrario; es cuando no haya ley aplicable que el tribunal todos ... Código Civil, Artículos 2, 4, 5, 7 y 22; 31 L.P.R.A. secciones 2, 4, 5, 7 y 22 respectivamente.

Contra ese trasfondo y a la luz de las disposiciones del Código Penal antes discutidas examinemos las disposiciones específicas del Código Civil que determinan la solución de este caso. ■

"La ley no concede acción para reclamar lo que se gana en un juego de suerte, envite o azar," dispone en lo pertinente nuestro Código Civil en su Artículo 1698. 31 L.P.R.A. sec. 4771. La disposición citada se refiere a los juegos prohibidos; el propio Código aclara en su artículo 1701 que "El que pierde en un juego o apuesta de los no prohibidos queda obligado civilmente." Es tan fuerte la política pública contenida en el Art. 1698 antes citado que aun en este caso de excepción del Art. 1701 el propio artículo 1701 añade que "la autoridad judicial puede, sin embargo, no estimar la demanda cuando la cantidad que se cruzó en el juego o en la apuesta sea excesiva, o reducir la obligación en lo que excediere de los usos de un buen padre de familia." 31 L.P.R.A. sec. 4774.

Los artículos del capítulo de nuestro Código Civil que trata sobre esta materia de juego y apuestas son iguales a los del Código Civil español, de donde proceden. Señala Puig Peña comentando estos artículos, que en general las

legislaciones han adoptado un temperamento ecléctico, permitiendo, y hasta fomentando, los juegos que contribuyen al ejercicio del cuerpo y prohibiendo los de azar o estricta suerte. (²) Discutiendo una situación parecida a la de autos el mismo autor expresa:

"Si el jugador, en un juego prohibido, pierde y no paga, podrá tener un reproche de su conciencia o, si se quiere, del círculo social en que vive; pero sabe que en el plano jurídico está libre de reclamación. Terminantemente dice el artículo 1798 que la ley no concede acción para reclamar lo que se gana en un juego de suerte, envite o azar. El incumplimiento, pues, está desprovisto de un recurso jurídico para restaurar el 'orden' perturbado. Y es que hay una causa torpe para ambas partes, y además de tipo penal, según dijimos, y cuando la nulidad de una obligación provenga de ser ilícita la causa u objeto del contrato, si el hecho constituye un delito o falta común a ambos contratantes carecerán de toda acción entre sí." Puig Peña, obra citada, p. 475.

Puig Brutau lo expresa lacónicamente: "el ordenamiento jurídico no interviene para obligar a pagar una deuda de juego..." (³) Sánchez Román señala que la ley civil es concordante con la penal, que prohibe los juegos de suerte o azar, al no conceder acción para reclamar lo que se gana en un juego de esta clase. (⁴) Castán reitera el concepto contenido en el art. 1798 español (que es idéntico al 1698 puertorriqueño) en el sentido de que la ley no concede acción para reclamar lo que se gane en un juego de azar y añade que resulta absurdo que siendo el juego prohibido una institución antijurídica se le pueda considerar siquiera fuente de obligaciones naturales. (⁵)  ■

(²) Federico Puig Peña, *Tratado de Derecho Civil Español*, Madrid, 1951, tomo 4, vol. 2, p. 470.

(³) José Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, 1956, Tomo 2, Vol. 2, p. 520.

(⁴) Felipe Sánchez Román, *Estudios de Derecho Civil*, 2da. ed., tomo 4, p. 824.

(⁵) José Castán Tobeñas, *Derecho Civil Español, Común* y Foral, 8ª ed., 1956, tomo 4, p. 680.

Manresa escribe: "Hallándose prohibidos por la ley los juegos de suerte, envite o azar, es evidente que la ley no podía autorizar que los mismos dieran acción para reclamar eficazmente lo ganado en un juego de dicha clase, y por eso no podía dejar de consignar el Código el precepto contenido en la primera parte del artículo 1.798, pues lo contrario hubiera sido incurrir en innegable contradicción." [6] Concluye dicho autor que "siendo nulo el acto por ser contrario a la ley que prohibe tales juegos y apuestas, no puede producir obligación ni efecto jurídico alguno." [7] Señala que hay acuerdo casi universal en la legislación de los pueblos cultos, y en sus concordancias menciona los códigos europeos e hispanoamericanos que contienen sobre el particular preceptos iguales o similares a los del nuestro. Manresa, obra citada, págs. 56-60.

Scaevola se manifiesta de acuerdo con Laurent, al éste comentar el Código Civil francés y con Giorgi al éste referirse al italiano, y expresa que en estos casos la demanda debe ser rechazada a limine, de plano, cuando el juego sea notoriamente ilícito, pues, dice, "no debemos exponer a los Tribunales de justicia como juguetes o entretenimiento de demandas claramente ilícitas, ni que siquiera cupiese el allanamiento a ellas, porque los Tribunales no podrían reconocerlo: se trata de cuestión de orden público." [8]

Además del art. 1698, antes citado, hay otros artículos del Código Civil que también se expresan con ejemplar claridad al respecto. El art. 1207 dispone que "Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público." [Énfasis suplido.] 31 L.P.R.A. sec. 3372. El 1227: "Los contratos sin causa, o con causa ilícita, no producen efecto alguno. Es

---

[6] José Ma. Manresa y Navarro, *Comentarios al Código Civil Español*, 5ta. ed., 1951, Tomo 12, p. 44.

[7] Manresa, obra citada, p. 53.

[8] Scaevola, *Código Civil*, Madrid, 1953, tomo 28, p. 154.

ilícita la causa *cuando se opone a las leyes o a la moral."* [Énfasis suplido.] 31 L.P.R.A. sec. 3432. Y el 1257, en su parte pertinente: "Cuando la nulidad provenga de ser ilícita la causa u objeto del contrato, si el hecho constituye un *delito o falta común a ambos contratantes, carecerán de toda acción entre sí,* y se procederá contra ellos, dándose además a las cosas o precio que hubiesen sido materia del contrato, la aplicación prevenida en el Código Penal respecto a los efectos o instrumentos del delito o falta." [Énfasis suplido.] 31 L.P.R.A. sec. 3516. ■

En *Pueblo* v. *Medina,* 19 D.P.R. 709 (1913) a la página 711, este Tribunal, por voz del Juez Asociado entonces Sr. del Toro, dijo: "Es cierto que el juego de lotería... está prohibido por la ley en Puerto Rico, y es cierto también que la ley no concede acción para reclamar lo que se gana en un juego de suerte, envite o azar, y que es una regla bien establecida que en transacciones con motivo de loterías, como generalmente en todos los contratos ilegales, las cortes dejarán a las partes en la misma situación en que se encuentren y no les prestarán su ayuda para obtener el cumplimiento o la rescisión del contrato... ya que el poder de la justicia no va a emplearse en ayudar a un individuo a conseguir el fruto de una transacción ilícita . . ." [Citas omitidas.] En igual sentido que el caso de *Medina,* supra, y tratándose también de lotería prohibida bajo el estatuto de California, que como hemos dicho es igual al nuestro, *vide People* v. *Lain,* 134 P.2d 284 (1943); *People* v. *Rosen,* 78 P.2d 727 (1938), 116 A.L.R. 991; y *Holmes* v. *Saunders,* supra. ■

Aunque cuando una persona ha aceptado los beneficios derivados de un contrato, ésta puede estar impedida de atacar la existencia, validez y efecto del mismo, una excepción bien reconocida a esa regla es que cuando el contrato es nulo por ser contrario a la política pública, la persona que ha aceptado un beneficio bajo el mismo no estará impedida de defenderse de dicho contrato al tratarse de poner en vigor

contra ella. *Pagán* v. *Sucn. Padilla*, 42 D.P.R. 968, 975 (1931) ; *Sánchez* v. *Coll*, 69 D.P.R. 925, 928 y 929 (1949).

Al enviarse por correo los boletos de la rifa y la carta circular ofreciendo los boletos, probablemente se cometió un delito federal y se violó una disposición de ley que castiga el enviar por correo cartas, circulares y publicaciones relativas a cualquier lotería o plan similar que ofrezca premios a base de suerte o azar. 62 Stat. 762, c. 645, Junio 25, 1948, 18 U.S.C.A. sec. 1302; Anotación en 96 L. ed. 312, "*Offenses against the mails: what is a lottery or similar scheme*"; 72 C.J.S., Post Office, sec. 53... Sobre el particular nada tenemos que resolver.

En vista de que el contrato que en esta acción se pretende que pongamos en vigor es ilegal y de que nuestra ley civil mediante varias disposiciones explícitas y claras determina que en esas circunstancias la ley no concede acción, o como dice Puig Brutau, el ordenamiento jurídico no interviene, resolvemos que se cometió el primer error señalado y que debe revocarse la sentencia apelada. Los litigantes han incurrido en una conducta prohibida por la ley y no podemos nosotros auxiliarlos para que perfeccionen su transgresión. Además, sería un contrasentido que por un lado la ley declarase delito público un acto y por otro lado los tribunales compeliesen a su consumación. Prima facie esta decisión puede parecer dura y legalista pero no lo es porque no está basada en inconsecuentes sutilezas de derecho sino en nuestro inevitable deber de sostener las leyes y de darle vigencia a una premisa que va al propio meollo del sistema de ley en que vivimos—aquella que preceptúa que la ley es igual para todos. En cuanto a la demandante, recordemos que habiendo ley aplicable no podemos recurrir a equidad y además, que tratándose, como se trata, de una cuestión de orden público, también hay una equidad que le debemos a la comunidad en general. La equidad de uno no puede basarse en la negación de la justicia para los demás.

No es necesario discutir los otros errores señalados. *Se revocará la sentencia del Tribunal Superior, Sala de San Juan, de 6 de mayo de 1957.*