EPIFANIO DE JESÚS GONZÁLEZ, demandante y recurrido, *v.* AUTORIDAD DE CARRETERAS, demandada y peticionaria.

*Número:* CC-97-300 *Resuelto:* 30 de abril de 1999

---

*Alex González*, abogado de la parte peticionaria; *Ramón Maurás Valentín*, abogado de la parte recurrida.

El Juez Asociado Señor Fuster Berlingeri emitió la opinión del Tribunal.

Nos toca examinar la validez de un contrato otorgado por el Estado, a la luz de lo dispuesto por el Art. 1207 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3372, que dispone que son nulos los contratos contrarios al orden público.

I

El 23 de junio de 1992, el recurrido Epifanio De Jesús González (en adelante De Jesús González) adquirió unos terrenos por el precio de $105,900 en el pueblo de Coamo con cabida aproximada de cien (100) cuerdas, o sea, alrededor de $1,059 la cuerda.

Transcurridos unos seis (6) meses después de la adquisición de los terrenos referidos por De Jesús González, la Autoridad de Carreteras comenzó el proyecto AC-555901-Coamo para construir la carretera PR-5559. La vía planificada pasaría a través de tres (3) parcelas de los terrenos mencionados pertenecientes ahora a De Jesús González. Al momento de iniciarse este proyecto, toda el área era zona rural. Los terrenos aludidos no tenían verja, no se usaban para ganado ni para pastos; unas menguadas estructuras que habían allí no tenían uso económico o productivo alguno.

Con el propósito de realizar el mencionado proyecto, la

Autoridad de Carreteras notificó a De Jesús González su intención de expropiar los terrenos necesarios de su propiedad. La expropiación referida se llevó a cabo eventualmente.

El 29 de marzo de 1993, De Jesús González y la Autoridad de Carreteras suscribieron dos (2) contratos denominados "Contrato de Entrada y Ocupación" referentes a las tres (3) parcelas del recurrido que eventualmente serían expropiadas y por donde pasaría la carretera PR-5559. Conforme a las determinaciones de hecho del foro de instancia —que no han sido impugnadas ante nos— es uso y costumbre de dicha agencia concertar este tipo de contratos cuando conviene al interés público comenzar un proyecto antes de que se tramite la expropiación de los terrenos correspondientes. Mediante tales contratos de entrada y ocupación, los dueños de los terrenos permiten al Gobierno la entrada a sus terrenos para que pueda iniciarse el proyecto, a cambio de determinadas concesiones que se le hacen a dichos dueños. De ordinario, las concesiones referidas son tasadas y evaluadas por la Oficina de Tasación y Construcción de la Autoridad de Carreteras, para verificar que sean proporcionales a los beneficios que el contrato en cuestión representa para el interés público. Sin embargo, en el caso de autos no se realizó por esa oficina el estudio correspondiente sobre los costos de las concesiones hechas al demandante previo a su otorgamiento.

Además de las cláusulas referentes al derecho de entrada y ocupación por parte de la Autoridad de Carreteras en los mencionados predios de De Jesús González, y del compromiso de esa agencia de adquirirlos en el futuro mediante el pago de su justo valor en el mercado, ambos contratos de entrada y ocupación otorgados por la Autoridad de Carreteras (cesionaria) y por De Jesús González (cedente) establecían las "Estipulaciones Adicionales" siguientes:

La cesionaria asume total responsabilidad por los daños que

surjan de la construcción, ejemplo: Desagües, Corrientes de Aguas Pluviales.

Que la cesionaria instale dos tuberías (de 4" y 6") entre las dos fincas afectadas, alumbrado en cada una de las entradas. Instalación [de] verja de alambre eslabonado en toda la e[xtens]ión de predio afectado de no menos de ocho pies de alto con portones en cada una de las entradas. Garantía [de] accesos [al] remanente de la finca con carretera a construirse. Este documento invalida cualquier documento firmado anteriormente.

Con idéntico propósito de adelantar la realización del proyecto AC-555901-Coamo, la Autoridad de Carreteras también otorgó contratos de entrada y ocupación sobre terrenos pertenecientes a otros dueños. No obstante, a ninguno de éstos se le concedieron los beneficios de alumbrado y verja eslabonada otorgados a De Jesús González.

El 21 de abril de 1993, *a menos de un (1) mes después de celebrarse los contratos de entrada y ocupación* entre De Jesús González y la Autoridad de Carreteras, ésta presentó una demanda de expropiación sobre las tres (3) parcelas objeto de los contratos, y De Jesús González recibió una compensación de *$25,350* por las 2.656 cuerdas de terreno que se le expropiaron, *o sea, un pago nueve (9) veces mayor* que el precio promedio pagado por De Jesús González por esas cuerdas unos meses antes de la expropiación.

La Autoridad de Carreteras, además, cumplió de modo parcial las concesiones acordadas, mencionadas antes. Construyó en toda la extensión de las fincas afectadas una verja de tres (3) pelos de alambre de púas sostenida por postes de cemento. Además, instaló alumbrado en una parte de la finca.

Inconforme con el cumplimiento parcial referido, De Jesús González solicitó infructuosamente a la Autoridad de Carreteras el cumplimiento específico de los contratos. El 29 de noviembre de 1994 presentó una demanda de incumplimiento de contrato y daños y perjuicios contra la Autoridad de Carreteras ante el Tribunal de Primera Instancia, Subsección de Distrito, Sala de Coamo. En la demanda, De

Jesús alegó "[q]ue a pesar de que el demandante se ha comunicado por escrito varias veces con la parte demandada y se ha reunido con ellos en varias ocasiones, la parte demandada se niega sin razón justificada alguna a dar cumplimiento específico del contrato y así cumplir con sus obligaciones". Alegó, además, que los trabajos realizados en sus terrenos por la Autoridad de Carreteras le impidieron sacar todo el provecho que tenía proyectado obtener de éstos, en previsión de lo cual había exigido a la demandada recurrente las condiciones adicionales estipuladas en los contratos de entrada y ocupación en controversia. El recurrido solicitó el cumplimiento específico de los contratos y la suma de $50,000 en compensación por los daños alegadamente sufridos por el incumplimiento.

La Autoridad de Carreteras contestó la demanda el 31 de enero de 1995 y admitió la celebración de los contratos con el demandante. Con relación a las estipulaciones adicionales, alegó que "las mismas deben tomarse en el contexto total del espíritu del contrato y de los planos y especificaciones del proyecto". Adujo, además, como defensa afirmativa, haber expuesto vías remediales al demandante "en pos (sic) de los términos y condiciones del Contrato y del proyecto y sus especificaciones".

Como parte de la prueba presentada, la Autoridad de Carreteras sometió al foro de instancia un estimado de costos por concepto de materiales e instalación del alumbrado, otro por concepto de la instalación de las verjas de alambre eslabonado y un tercero por concepto de instalación de camisillas de tubos. La totalidad de los costos aludidos por las instalaciones a ser realizadas por la Autoridad de Carreteras, según pactadas originalmente, ascendía a *$98,950*, según lo determinó el foro de instancia, aparte del altísimo precio pagado por los predios expropiados.

El 29 de enero de 1997, luego de celebrada la vista evidenciaria y presentados los correspondientes memorandos de derecho solicitados a las partes, el Tribunal de Primera

Instancia declaró sin lugar la demanda por considerar nulos los contratos de entrada y ocupación otorgados por las partes, por contravenir éstos la moral y el orden público. Oportunamente, De Jesús González apeló ante el Tribunal de Circuito de Apelaciones. Alegó que había errado el Tribunal de Primera Instancia al decretar nulos los contratos en cuestión. El 29 de abril de 1997 el tribunal apelativo expidió el auto y revocó al foro de instancia.

El 5 de junio de 1997 la Autoridad de Carreteras acudió ante nos mediante un recurso de *certiorari*. El 18 de julio de 1997 expedimos el recurso. El 5 de noviembre de 1997 la Autoridad de Carreteras presentó su alegato y, luego de varios incidentes procesales relacionados con la representación legal del recurrido, éste presentó su alegato el 13 de noviembre de 1998. Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

## II

Como se sabe, en materia de contratos, nuestro ordenamiento jurídico se caracteriza por brindar gran libertad de acción a los particulares que desean obligarse, reconociéndose así la autonomía de la voluntad de los contratantes. No obstante, esta autonomía no es ilimitada. Véase F. Puig Peña, *Compendio de Derecho Civil Español*, Madrid, Eds. Pirámide, 1976, Vol. III, pág. 339.[1] Al tratar este aspecto de los contratos, dispone nuestro Código Civil que "[l]os contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público". Art. 1207 del Código Civil de Puerto Rico, *supra*.

---

[1] Señala Puig Peña con mucho acierto que el principio de la autonomía de la voluntad no sólo ha perdido la omnipotencia que tuvo por siglos, sino que en la actualidad se trata de un principio muy limitado. Una de las causas de ello, nos dice, es la penetración de consideraciones *de orden social y ético* en el campo de la contratación. Particulariza "la tendencia a articular el contrato dentro de las normas que preside el interés general".

Es por tal razón que, independientemente del tipo de contrato de que se trate y de la importancia que éste merezca para las partes contratantes, es nulo y, por lo tanto, inexistente un contrato que resulte contrario a las leyes, a la moral o al orden público. *Morales v. Municipio de Toa Baja,* 119 D.P.R. 682 (1987); *In re Pagán Ayala,* 117 D.P.R. 180 (1986); *Sánchez Rodríguez v. López Jiménez,* 116 D.P.R. 172 (1985); *Asoc. de Condóminos v. Seguros Arana,* 106 D.P.R. 133 (1977); *Franceschi v. Texaco P.R., Inc.,* 103 D.P.R. 759 (1975); *Berrocales v. Tribunal Superior,* 102 D.P.R. 224 (1974); *C.R.U.V. v. Peña Ubiles,* 95 D.P.R. 311 (1967). En tales casos de nulidad, incluso una parte que se haya beneficiado del contrato en cuestión puede impugnarlo por ser contrario a la ley, a la moral o al orden público. *Rasa Eng. Corp. v. Daubón,* 86 D.P.R. 193 (1962); *Serra v. Salesian Society,* 84 D.P.R. 322 (1961); *Pagán v. Sucn. Padilla,* 42 D.P.R. 968 (1931).

Conforme con nuestro deber de dar concreción en cada caso a los conceptos generales del ordenamiento jurídico, *Casiano, Jr. v. Borintex Mfg. Corp.,* 133 D.P.R. 127 (1993), nos hemos pronunciado *in extenso* respecto al concepto de "orden público". Así pues, en *Hernández v. Méndez & Assoc. Dev. Corp.,* 105 D.P.R. 149, 153–154 (1976), nos expresamos sobre el alcance de dicho concepto precisamente en relación con la validez de los contratos. Señalamos entonces que:

> "Orden público" es el conjunto de valores eminentes que guían la existencia y bienestar de una sociedad. *El concepto orden público recoge y ampara un interés social dominante por su trascendencia, por el número de personas que afecta y por la valía de los derechos que tiende a proteger. En gran medida el orden público es acopio de normas de moral y de ética pública que en ocasiones alcanzan su exposición en ley, pero que aun sin esa expresa declaración legislativa, constituyen principios rectores de sabio gobierno* nacidos de la civilización y fortalecidos por la cultura, la costumbre, por la manera de ser, en fin por el estilo de una sociedad. Castán ve tanto en la costumbre como

en la ley el modo de manifestación de la voluntad social predominante.

El principio de autonomía de la voluntad de los contratantes está consagrado en el Art. 1207 del Código Civil pero con las limitaciones que establece. "El orden público [dice Manresa] que no significa [cuando se habla de contratos] el material mantenimiento de la paz pública, *representa el interés público, social y de ley en el Derecho privado*, lo permanente y esencial de las instituciones, *lo que aún favoreciendo a algún individuo en quien se concreta el derecho, no puede quedar a su arbitrio. ... La evolución jurídica camina decididamente hacia una infiltración cada vez mayor de elementos éticos y sociales*, de tono imperativo que de modo general en absoluto disciplinaran las relaciones de derecho privado, *imprimiéndoles carácter público a expensas del principio de autonomía de la voluntad* que, de esta suerte, va perdiendo volumen en su clásica y amplia esfera de acción ...". (Citas omitidas y énfasis suplido.)

■ Recientemente, al reiterar esta definición, indicamos que aun cuando el orden público restringe la voluntad de la persona en el ámbito contractual, tal restricción a la larga garantiza en gran medida que se realice dicha voluntad. Señalamos que "[c]iertamente, el orden público es parte de la política pública que permite y contribuye a una mejor convivencia social". *Unisys v. Ramallo Brothers*, 128 D.P.R. 842, 851 (1991).

■ De igual modo se concibe este importante concepto en la doctrina civilista. El orden público es considerado como parte integrante del bien común y constituye "el fin al que las normas de un determinado ordenamiento jurídico tienden". J.A. Doral, *La noción de orden público en el Derecho Civil español*, Pamplona, Ediciones Universidad de Navarra, 1967, pág. 38. Esta noción del orden público también es compartida por De Castro, quien concibe como finalidad del orden público el evitar que el Estado tenga que imponer algo que repugne al buen sentido de lo justo o de lo moral, sólo por el hecho de que se trata de la voluntad de los contratantes. F. De Castro, *Notas sobre las limitaciones intrínsecas de la autonomía de la voluntad*, XXXV(IV) An. Der. Civ. 987, 1049 (1982).

En su abarcador estudio de lo que constituye el concepto normativo "orden público" en el referido artículo del Código Civil, publicado en los *Comentarios al Código Civil y compilaciones forales*, dirigidos por Miguel Albaladejo y Silvia Díaz Albart, Madrid, Ed. Rev. Der. Privado, 1993, T. XVII, Vol. 1-A, págs. 100–296, Antonio Reverte Navarro señala que el orden público es un límite contra los abusos del ejercicio de la autonomía de la voluntad en materia contractual. Añade que "[e]l orden público es un *instrumento de operatividad de valores* ... reflejo de unas convicciones sociales" que actúa como instrumento jurídico "progresivo y dinamizador del ordenamiento legal para acomodarlo al sentir y a la realidad social del tiempo en que deba ser aplicado" e indica también que incorpora "los principios fundamentales sobre los que descansa el ordenamiento jurídico de un país". Íd., págs. 269–270. Citando una sentencia del Tribunal Supremo de España, de 5 de abril de 1966, nos dice el erudito comentarista que:

> El orden público concreta y cristaliza en el ordenamiento jurídico los criterios básicos y convicciones colectivas, al condensarse en dicho concepto ... el conjunto de principios jurídicos, públicos y privados, políticos, económicos, sociales e, incluso, morales, que constituyen el fundamento de un ordenamiento jurídico en un momento concreto. Íd., pág. 265.

Con este eminente concepto coincide Lacruz Berdejo, para quien el orden público abarca los principios generales en que las leyes se inspiran y que de ellas se deducen. J.L. Lacruz Berdejo, *Elementos de Derecho Civil*, Barcelona, Ed. Bosch, 1987, T. II, Vol. 2, pág. 159.

Nuestros pronunciamientos anteriores, como las expresiones de la doctrina antes citada, reflejan la eficacia del concepto "orden público" como medio para lograr un balance entre la autonomía de la voluntad de las partes y la imprescindible protección del bienestar común. Como nosotros mismos señalamos en *Serra v. Salesian Society*, supra, pág. 335, los tribunales no podemos auxiliar a liti-

gantes que han incurrido en conducta contraria a ley, la moral o el orden público. No podemos auxiliarlos para que perfeccionen su transgresión. "*[H]ay una equidad que le debemos a la comunidad en general.*" Íd. Es por tal razón que, según De Castro, *supra*, la doctrina ha encontrado en el orden público una base dogmática para declarar nulas las cláusulas que atentan crasamente contra el buen orden del sistema jurídico, *como es el caso de las cláusulas de los contratos de carácter leonino.* Para De Castro, es cónsono con la lógica jurídica reseñada considerar inválidas las disposiciones contractuales de carácter leoninas. De Castro, *supra*, págs. 1057 y 1058. Reverte Navarro, en la obra mencionada antes, también identifica las cláusulas abusivas o leoninas como contrarias al orden público. Albaladejo y Díaz Albart, *op. cit.*, págs. 156–157. Se trata de cláusulas que atentan contra el equilibrio en las prestaciones contractuales que constituye una premisa intrínseca de los contratos válidos. Para De Castro, estas cláusulas que conceden ventajas injustificadas son contrarias a la justicia conmutativa; contrarias a la reciprocidad de prestaciones e interés que sirven de fundamento esencial de la legitimidad de los contratos. Íd., pág. 198.

Como norma general, para los efectos de la aplicación de las disposiciones y doctrinas referentes a los contratos, el Estado Libre Asociado de Puerto Rico se considera como un contratante privado. Cuando el Estado contrata, la interpretación del contrato debe hacerse como si se tratara de una contratación entre dos personas particulares. *Zequeira v. CRUV*, 83 D.P.R. 878, 880–881 (1961); *Rodríguez v. Municipio*, 75 D.P.R. 479, 494 (1953). Ello significa que una vez el Estado suscribe un contrato con una persona privada, ambos están obligados por las normas generales relativas a los contratos y sus correspondientes interpretaciones a la luz de nuestros pronunciamientos aplicables.

Por otro lado, cuando la contratación involu-

cra el uso de bienes o fondos públicos, hemos insistido, además, en la *aplicación rigurosa* de todas las normas pertinentes a la contratación y desembolso de esos fondos, a los fines de proteger los intereses y dineros del Pueblo. Hemos enfatizado que el manejo prudente de fondos públicos está saturado de intereses de orden público. Hemos resaltado normativamente la imperiosa necesidad de evitar el dispendio, la extravagancia, el favoritismo y la prevaricación en los contratos gubernamentales. Véanse: *Fernández & Gutiérrez v. Mun. San Juan*, 147 D.P.R. 824 (1999); *Hatton v. Mun. de Ponce*, 134 D.P.R. 1001 (1994); *Mar-Mol Co., Inc. v. Adm. Servicios Gens.*, 126 D.P.R. 864 (1990); *Ocasio v. Alcalde Mun. de Maunabo*, 121 D.P.R. 37, 54 (1988); *Morales v. Municipio de Toa Baja*, supra, pág. 693; *Cancel v. Municipio de San Juan*, 101 D.P.R. 296, 300 (1973); *Justiniano v. E.L.A.*, 100 D.P.R. 334, 338 (1971). Ciertamente, al interpretar el sentido contemporáneo de la disposición del Código Civil que requiere que los contratos no sean contrarios al orden público, no podemos ignorar que en la contratación por el Estado, la sana y recta administración de los fondos del Pueblo está revestida del más alto interés público, y que todo organismo gubernamental está obligado a observar cabalmente la esencia del principio consagrado en la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, de que los fondos públicos sólo pueden gastarse para fines públicos legítimos. Como hemos señalado, todas las actuaciones del Gobierno están siempre circunscritas por la Constitución. El Gobierno, como contratante, sigue siendo el Gobierno, y no puede actuar de un modo que esté reñido con los principios que encarna el orden constitucional. *C.R.U.V. v. Peña Ubiles*, supra, págs. 315–317. El concepto del "orden público" del Art. 1207 del Código Civil, *supra*, pues, incluye en su contenido no sólo la prohibición de cláusulas contractuales abusivas o leoninas discutidas antes, sino también la política pública de origen constitucional que preconiza el

uso escrupuloso de los fondos públicos.(²) El concepto "orden público", como acopio y reflejo de los principios generales del Derecho, ciertamente recoge el alto valor jurídico que varios Jueces de este Foro expresaron de manera esclarecida en *A.E.E. y A.A.A. v. P.N.P.*, 128 D.P.R. 294, 294–295 (1991), voto concurrente del Juez Asociado Señor Negrón García, al cual se unieron los Jueces Asociados Señores Rebollo López y Andréu García, cuando determinamos que no podían usarse fondos públicos para pagar salarios de personas contratadas por agencias gubernamentales si tales personas no desempeñaron labor alguna para esas agencias:

> "... el desembolso indebido o ilegal de fondos públicos —en sus formas múltiples, a veces burdas y otras sofisticadas— son actos incompatibles con el sistema de gobierno democrático consagrado en nuestra Constitución y apuntalado en el respeto a la dignidad humana y el dinero del pueblo como único soberano. *No importa las modalidades que adopten ni la jerarquía del funcionario involucrado; las mismas son intolerables.* En última instancia, quien verdaderamente se perjudica, no sólo en lo económico sino en lo moral, es la ciudadanía en general .... Es, pues, obligación de los tribunales reivindicar esos valores fundamentales." (Énfasis en el original suprimido y énfasis suplido.)

Nos toca, pues, examinar el contrato suscrito por la Autoridad de Carreteras y De Jesús González a la luz de la normativa reseñada.

## III

Al analizar las "Estipulaciones Adicionales" de los contratos en cuestión, es evidente que éstas constituían cláu-

---

(²) Recientemente reiteramos nuestra responsabilidad de velar por que los fondos públicos "respondan directamente a las necesidades de la ciudadanía". Indicamos que para que una erogación de fondos del Pueblo tenga un "fin público" y "carácter legítimo", ésta debe redundar en beneficio de la salud, seguridad, moral y bienestar general de la ciudadanía, es decir, al bienestar general. *P.P.D. v. Gobernador I*, 139 D.P.R. 643 (1995).

sulas irrazonables, que sólo beneficiaban a una de las partes, a expensas del uso debido de los fondos públicos. El beneficio obtenido por el Estado al suscribir los contratos no era proporcional de modo alguno a los costos en que incurriría la agencia para cumplir con lo pactado, sobre todo cuando menos de un (1) mes más tarde, la Autoridad de Carreteras expropió los terrenos en cuestión. Por el "beneficio" de comenzar la carretera en cuestión sólo tres semanas antes de que se expropiaran los predios referidos, la agencia invertiría $98,950 en concesiones al dueño de esos predios. Y ello sería además de haber pagado un precio elevadísimo por las 2.696 cuerdas de terreno expropiadas. No cabe dudas, pues, que nos encontramos frente a cláusulas *leoninas*, que además son contrarias a la política pública sobre el *uso escrupuloso de los fondos del Pueblo*, reseñada antes. Desde esta doble perspectiva, es claro que se trata de cláusulas contractuales contrarias al orden público y, por lo tanto, violatorias del Art. 1207 del Código Civil, *supra*.

Por otro lado, nótese además la forma irregular en que se celebró el otorgamiento de los contratos en cuestión. En una clara desviación de los procedimientos acostumbrados por la Autoridad de Carreteras, ésta no evaluó, mediante el proceso institucional establecido para ello, el costo de las concesiones que acordó a favor de De Jesús González, previo al otorgamiento del contrato. Más aún, la Autoridad, al aceptar los requerimientos del recurrido, se obligó al cumplimiento de unas obligaciones diferentes a las que de ordinario acostumbra realizar, según aduce la agencia. Tal es el caso de la altura y material de las verjas que se obligó a construir la Autoridad de Carreteras en este caso. Tradicionalmente, las verjas que instala la Autoridad de Carreteras en sus proyectos son de una altura de seis (6) pies, contrario a la de ocho (8) pies a que se obligó, y en su gran mayoría el material utilizado es alambre de púas con postes de concreto, como el que en efecto instaló, y no de alam-

bre eslabonado como se indica en las estipulaciones adicionales del contrato.

Cabe destacarse, finalmente, que no empece a que la Autoridad de Carreteras otorgó otros contratos de entrada y ocupación similares al que hoy nos ocupa con los dueños de otros terrenos por donde pasaría la misma carretera PR-5559, que aquí nos concierne, ninguno contenía concesiones similares a las concedidas a De Jesús González.

No sabemos, a ciencia cierta, porqué la Autoridad de Carreteras incurrió en las irregularidades aludidas en el otorgamiento de estos contratos. La agencia estuvo representada en ellos por el Director del Área de Adquisición y Administración de Propiedades, quien fue la persona que suscribió el contrato por la agencia.[3] En el tribunal de instancia, y ante nos ahora, la Autoridad de Carreteras se ha limitado a señalar que el contrato fue otorgado "con premura insólita" y "novatismo", haciendo así una vaga admisión de que no fue concebido y formulado de manera propia. Sin embargo, surge al menos que los contratos en cuestión no se hicieron con la cautela y circunspección que debe tenerse al comprometer los fondos del Pueblo.

 Hemos señalado que los tribunales están facultados para velar por el cumplimiento de los contratos y que no deben relevar a una parte del cumplimiento de su obligación contractual cuando dicho contrato sea legal y válido, y no contenga vicio alguno. *Cervecería Corona v. Commonwealth Ins. Co.*, 115 D.P.R. 345 (1984); *Olazábal v. U.S. Fidelity, etc.*, 103 D.P.R. 448 (1975); *Mercado, Quilichini v. U.C.P.R.*, 143 D.P.R. 610 (1997). De ordinario, este Tribunal ha respetado la autonomía de la voluntad de los contratantes. No obstante, nos encontramos ante dos (2)

---

[3] Suponemos que se le había delegado la autoridad de suscribir tales contratos. Nadie ha cuestionado que tenía la facultad de suscribirlo. La ley que crea el Departamento de Transportación y Obras Públicas, al cual está adscrita la Autoridad de Carreteras, permite tal delegación del Secretario. Art. V, Plan de Reorganización Núm. 6 de 1971 (3 L.P.R.A. Ap. III).

contratos con cláusulas que, por todas las razones señaladas antes, contravienen el orden público y que se realizaron de forma irregular, sin observar rigurosamente las normas y prácticas usuales que se siguen en estos contratos públicos, que nuestra política judicial requiere que se cumplan cabalmente. Forzoso es concluir la nulidad de ambos contratos, de entrada y ocupación, que nos ocupan.

Por los fundamentos antes expuestos, *procede la revocación de la sentencia dictada por el Tribunal de Circuito de Apelaciones y la consecuente reinstalación del dictamen del foro de instancia. De igual forma, debe devolverse el caso al Tribunal de Primera Instancia para que determine el valor preciso de las mejoras que la Autoridad de Carreteras realizó en los terrenos del demandante, y lo compare con lo que hubiese sido justo que la Autoridad de Carreteras pagase a De Jesús González por los limitados derechos de entrada y ocupación que aquélla ejerció sobre los terrenos del recurrido previo a su expropiación, para entonces proceder el tribunal a hacer los ajustes correspondientes entre dichas partidas y ordenar lo que proceda conforme a ello.*

*Se dictará sentencia a los fines señalados.*

Los Jueces Asociados Señores Hernández Denton y Corrada Del Río concurrieron sin opinión escrita.