[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 601 
David Barber, in his capacity as District Attorney for the Tenth Judicial Circuit of Alabama, appeals from a judgment in favor of the Jefferson County Racing Association, Inc., d/b/a the Birmingham Race Course ("the JCRA"), and Innovative Sweepstakes Systems, Inc. ("Innovative") (referred to collectively as "the owners"), in the owners' action for injunctive and declaratory relief as to allegations that they are operating illegal gambling devices at the Birmingham Race Course ("the race course"). We reverse that judgment and render a judgment for Barber.
 I. Procedural Background
On December 15, 2005, the owners began operating at the race course an activity they advertised as a "Quincy's MegaSweeps" ("the MegaSweeps"). The activity was interrupted on December 22, 2005, when Jefferson County Sheriff Mike Hale began executing a warrant authorizing the seizure of all records and computer equipment related to the operation of the MegaSweeps. That same day, the JCRA filed a complaint against Sheriff Hale seeking declaratory and injunctive relief from the seizure. *Page 602 
The JCRA alleged that it was "conducting a sweepstakes
promotion at the race course to promote the race course and its lawful activities as well as the opening of an internet cafeand digital communications center." (Emphasis added.) The JCRA sought a judgment (1) declaring that its MegaSweeps operation was lawful and (2) enjoining Sheriff Hale from interfering with its MegaSweeps operation. It also sought a judgment declaring that the "Alabama gambling statutes . . . upon which the . . . search and seizure [were] based" are "unconstitutionally vague." It more specifically challenged the constitutionality of Ala. Code 1975, § 13A-12-20(4), whichdefines gambling. By consent of the parties, the trial court issued a preliminary injunction, enjoining further seizure of equipment and ordering the return of all property that had been removed from the race course. The court, however, also enjoined operation of the MegaSweeps pending resolution of the underlying dispute.
On December 29, 2005, Innovative, as the owner of the computer equipment and system at issue in this case, moved to intervene. That motion was granted on January 4, 2006. On January 17, 2006, Barber moved to intervene and filed a counterclaim for declaratory and injunctive relief. Barber sought a judgment declaring (1) "that the components of the [MegaSweeps] operation . . . are in fact illegal gambling devices that are subject to forfeiture" and (2) "that the operation . . . is an illegal lottery under Section 65 of the Alabama Constitution and Alabama Code § 13A-12-20, et seq." He also sought an order permanently enjoining the operation of "such gambling devices and/or a lottery in Jefferson County." That same day, the trial court granted Barber's motion to intervene. The Alabama Attorney General appeared in the case and filed a memorandum in opposition to the owners' constitutional challenge.
Subsequently, on January 31, 2006, following a bench trial, the trial court — without specifically referring to Barber's counterclaims — entered a judgment declaring that the MegaSweeps operation was not a lottery and that it did not involve the use of slot machines or gambling devices. The court permanently enjoined Sheriff Hale "from further actions against [the MegaSweeps] operations at the [race course], provided [the owners] operate the [MegaSweeps] as represented."
Sheriff Hale did not appeal. However, on February 14, 2006, Barber filed a notice of what purported to be an interlocutory appeal in case no. 1050625, challenging the injunctive aspect of the trial court's judgment. Specifically, the issue, as Barber framed it on his docketing statement, was "[w]hether the trial court properly enjoined law enforcement from seizing equipment used in such operation or otherwise taking action against the MegaSweep[s] operation at the Birmingham Race Track." Concurrently, he filed a motion in the trial court to alter, amend, or vacate the judgment, or to grant a new trial. In that motion, Barber contended, among other things, that the January 31 judgment was not final because it did not refer specifically to his counterclaims. That same day, the owners moved this Court to dismiss Barber's interlocutory appeal. They contended that the January 31, 2006, judgment was, in fact, a final judgment, effectively disposing of Barber's counterclaims and precluding an interlocutory appeal. Furthermore, they argued, Barber's pending postjudgment motion rendered an appeal of afinal judgment premature.
On March 21, 2006, the trial court denied Barber's postjudgment motion. The following day, the owners apprised this *Page 603 
Court of that order and asserted that Barber's interlocutory appeal merged with the final judgment, from which he had a right to appeal. On that ground, they urged us to dismiss the appeal in case no. 1050625. Also, on March 22, 2006, Barber appealed from the postjudgment order, in case no. 1050857. The appeals were consolidated for briefing. Various amici curiae filed briefs in support of Barber, namely, (1) Governor Bob Riley, (2) Attorney General Troy King, (3) the Alabama District Attorneys Association, and (4) the Foundation for Moral Law ("the Foundation").
The parties now agree that all the issues presented in this dispute are subsumed in case no. 1050857. Consequently, we dismiss the appeal in case no. 1050625 as moot.
 II. Case No. 1050857
Two dispositive issues are presented: (1) whether the MegaSweeps operation at the race track involves the use of slot machines and, if so, (2) whether the definition of gambling in § 13A-12-20, Ala. Code 1975, is unconstitutionally vague.
 A. Standard of Review
Our review of a declaratory judgment is ordinarily governed by the ore tenus standard. State Farm Mut. Auto. Ins.Co. v. Brown, 894 So.2d 643 (Ala. 2004); Alfa Mut. Ins.Co. v. Small, 829 So.2d 743 (Ala. 2002). However, the standard "is not applicable where the evidence is undisputed, or where the material facts are established by the undisputed evidence." Salter v. Hamiter, 887 So.2d 230, 234
(Ala. 2004). Neither does the ore tenus rule apply to the trial court's legal conclusions or misapplications of the law to undisputed facts. Eubanks v. Hale,752 So.2d 1113, 1144-45 (Ala. 1999).
The material facts in this case are undisputed or uncontroverted and the questions presented are legal ones, as the trial court expressly acknowledged. Therefore, our review isde novo. Brown, 894 So.2d at 647.
 B. Slot Machine
Barber contends that the MegaSweeps operation involves the use of slot machines, in violation of Ala. Code 1975, §13A-12-27. Section 13A-12-27 provides, in pertinent part:
 "(a) A person commits the crime of possession of a gambling device if with knowledge of the character thereof he manufactures, sells, transports, places or possesses, or conducts or negotiates any transaction affecting or designed to affect ownership, custody or use of:
 "(1) A slot machine; or
 "(2) Any other gambling device, with the intention that it be used in the advancement of unlawful gambling activity."
 A "slot machine" is defined as follows:
 "A gambling device that, as a result of the insertion of a coin or other object, operates, either completely automatically or with the aid of some physical act by the player, in such a manner that, depending upon elements of chance, it may eject something of value. A device so constructed or readily adaptable or convertible to such use is no less a slot machine because it is not in working order or because some mechanical act of manipulation or repair is required to accomplish its adaptation, conversion or workability. Nor is it any less a slot machine because apart from its use or adaptability as such it may also sell or deliver something of value on a basis other than chance."
Ala. Code 1975, § 13A-12-20(10) (emphasis added).[1] *Page 604 
 "A person engages in gambling if he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he or someone else will receive something of value in the event of a certain outcome."
Ala. Code 1975, § 13A-12-20(4). "Something of value" is defined as "[a]ny money or property, . . . or article exchangeable for money or property or any form of credit or promise directly or indirectly contemplating transfer of money or property or of any interest therein, or involving extension of a service entertainment or a privilege of playing at a . . . scheme without charge." Ala. Code 1975, § 13A-12-20(11).
Barber insists that the trial court erred in discounting the operation and effect of key pieces of computer equipment when they are integrated within the MegaSweeps network. He contends that when those pieces are considered "collectively," they are gambling devices within the context of § 13A-12-27. This contention requires a description of the components of the MegaSweeps system and how it functions as an integrated whole in its historical context.
1. Function of the System
On January 14, 2006, before Barber moved to intervene, the parties filed a joint stipulation of facts ("the stipulation"). According to the stipulation, as supplemented by facts that are undisputed or uncontroverted, Innovative is a wholly owned subsidiary of Multimedia Games, Inc. ("Multimedia"), which "provides computer equipment and software to promote the gaming activities of Native American, charitable gaming establishments, and state, national, and international lotteries."[2] In 2005, Multimedia began discussions with the owners of the race course regarding the development of a project to promote the race course, the "primary business activity" of which "is pari-mutual wagering and racing activities for its patrons." Those discussions produced the scheme for the MegaSweeps operation.
To implement its plan, Multimedia devised a sophisticated computer system to be installed at the race course.[3] The JCRA describes it as a "unique one-of-a-kind system that was basically developed from scratch." JCRA's brief, at 58 n. 18. Essentially, it involved the sates of Internet access
in conjunction with chances to win cash prizes.
"Innovative was incorporated to continue Multimedia's implementation, design and deployment of the system.
The Internet-access aspect of the system installed at the race course is variously described as a "cyber cafe" or "the CyberCenter."
 "8. Patrons obtain access to the services of the CyberCenter by purchasing computer access time (`cybertime') at a rate of one (1) dollar for four (4) minutes. . . .
 "9. The rate charged for [cybertime] is fair market value.
 ". . . . *Page 605 
 "22. The products and services offered at the CyberCenter . . . provide for[, among other things,] . . . personal computer usage, Internet access and voice communications via the Internet, and information on pari-mutual wagering. . . . The CyberCenter features computer terminals that provide access to a personal computer with broadband Internet connection where users can browse the Internet, access email, and learn about and use commercial software applications licensed for use on that computer terminal. The package offered at the CyberCenter includes . . . services such as photocopying, printing, photographic reproduction . . .; access to software programs for use in preparing tax returns, computer games, and basic computer skills tutorials (for Windows, Microsoft Office, other programs and the Internet itself); and the sale or rental of certain computer hardware, including headsets that can be used for voice communications and flash drives for data retention and transfer. . . .
 ". . . .
 "24. Customers must have an account in order to purchase cybertime. With that account number, the System keeps track of how much cybertime a customer has purchased and how much that customer has used. The account is accessed through a plastic account access card containing an encoded magnetic strip similar to a credit card. Once cybertime has been purchased, it can be used at any one of the . . . computer terminals located in the CyberCenter on both floors of the Birmingham Race Course facility. The computer terminals have restricted access requiring use of attached card swipe readers."
The gaming aspect of the system is explained in the stipulation as follows:
 "10. The Birmingham Race Course offers a sweepstakes called the [MegaSweeps]. For every one (1) dollar of cybertime purchased, the consumer receives 100 entries in the [MegaSweeps]. The results of the respective entries, i.e., whether each is a winning or losing entry, are predetermined when the consumer purchases cybertime at the point of purchase.
 "11. The customer determines whether the sweepstakes entries are winners by reading the results online or on one of the 116 computers in the CyberCenter, calling a toll-free phone number, or by placing the computer access card in one of more than 1,300 electronic readers [`the readers'] that display winning and losing entries in an entertaining format, but standing alone are otherwise dumb terminals. Once the results have been revealed, winning entries are paid. . . .
 ". . . .
 "18. All sweepstakes entries, whether obtained with the purchase of cybertime, by mail [without a purchase], or by request at the facility [without a purchase], are drawn in the same manner. Entries cannot be changed or altered at any time.
 "19. Although a customer does not immediately know the sweepstakes results when the entries are [assigned] to him, the customer is provided with a number of ways to reveal the results. The customer can learn the outcomes of his sweepstakes entries by accessing a website remotely, using the computer terminals, by calling a toll-free phone number, or by revealing the outcomes on a reader.
 "20. The Birmingham Race Course has over 1,300 readers. The readers are divided among different entertainment scenarios, and each reader reveals a *Page 606 
batch of entries in a quantity selected by the customer. The customer swipes his account card to activate a reader. Once activated, the customer presses a button on the reader to see the results of the selected number of entries.
 "21. The entries the customer receives after the purchase of cybertime are the same entries that are revealed. When a customer's sweepstakes entries are revealed, those sweepstakes entries are marked as revealed and they cannot be revealed again. If a customer chooses to use a reader to reveal entries, a server selects the order in which a customer's outcomes are revealed. The total prize value of the subset is sent to the reader so the reader can show the outcome to the customer. For example, when a customer elects to reveal five of the customer's sweepstakes entries, a server might select five of the customer's sweepstakes entries that happen to be non-winners, in which case the appropriate communication would be relayed to the reader, and the reader would display that outcome to the customer. Alternatively, a server might select five of the customer's sweepstakes entries that happen to be winners and relay the appropriate communication to the reader. The reader will ultimately display the exact value of the customer's sweepstakes entries."
(Emphasis added.)
The trial court found that the "readers are designed and arranged so that they look and sound like slot machines." Lt. Paul Logan, who conducted preseizure "undercover operations" at the race track, stated that the readers would indicate a winning entry by "dings, tones and simulated change falling as in a slot machine." According to Lt. Logan, the readers also had casino-style names "such as Bunch O'Luck, Crazy Blue Streak, Reel Thrills, Sun Dogs, Flamingo 7's, Major Money, Krazy Farm, Ed McMahon's Star Magic, Cherry Pop, Fruit Cocktail Deluxe, China Seas, Lock and Win, Double Cash Money, and many others." The payout percentage, that is, the ratio of winnings to the amount expended by the players, is 92%. Indeed, the typical reader was originally manufactured as a slot machine and had been modified for use in conjunction with the peculiar components of the MegaSweeps system, which include:
 "26. Central Database. The central component of the System is a database where the customer's account is tracked. The account maintains the cardholder's information, the balance of purchased cybertime remaining, the quantity of sweepstakes entries issued, and the balance of sweepstakes winnings revealed, but not yet redeemed.
 "27. Point of Sale Terminals. The Point of Sale Terminals allow customers to purchase cybertime for their accounts and to redeem any revealed winning sweepstakes prizes. The Point of Sale Terminal is connected to the Universal Point of Sale server which handles all transactions and connections with the Central Database. When a customer purchases cybertime a request is forwarded from the Point of Sale to the Universal Point of Sale server where it is credited to the customer's account in the Central Database. This sale of cybertime also triggers the System to give a customer promotional sweepstakes entries by associating them with the Customer's account at the time of purchase.
 "28. Computer Terminals. The Computer Terminals are state-of-the art personal computers that are the primary access point for the services sold by the CyberCenter. The Computer Terminals are equipped with a suite of licensed commercial software applications (like *Page 607 
Microsoft Office) that can be used by customers on the local computer and they allow broadband access to the Internet. The Computer Terminals have attached swipe card readers that provide customers access by swiping their account access cards. The Computer Terminals are connected to a server called the CyberCenter Kiosk Webservice (`Computer Terminal server') that deducts cybertime from the customer's account as the customer uses access time at the Computer Terminal.
 "29. The Readers. The Readers reveal sweepstakes entries. The Readers are designed to show sights and sounds that heighten the suspense and excitement of the sweepstakes. The Readers reveal the outcomes to the customers in groups. The Readers do not determine the outcome of the sweepstakes; rather, they merely reveal the outcome to the customer in an entertaining manner. The only random process that takes place on the Reader is the determination of which entertaining display to use to show a losing outcome or a winning outcome of equal value. For example, a Reader might have several hundred different ways of showing a non-winning sweepstakes outcome to the customer.
 "30. Servers. The Point of Sale Terminals, Computer Terminals, and Readers are connected to three separate servers. The Universal Point of Sale server runs from the CyberCenter back office and handles requests from both the Point of Sale and Recharge Kiosks. The Universal Point of Sale server credits the customer's account in the database with cybertime when purchases are made at either the Point of Sale or the Recharge Kiosks and gives the customers sweepstakes entries. The Computer Terminal server also runs from the CyberCenter back office and controls access to the Computer Terminals. When a customer swipes an account access card at a Computer Terminal, the Computer Terminal server determines whether the customer has cybertime available. If so, the Computer Terminal server allows the customer access to the Computer Terminal. The Computer Terminal server keeps a record of the cybertime available on the customer's account. The Reader server determines which of the customer's sweepstakes entries will be revealed on any given request. For example, if a customer makes a request at a Reader to reveal five sweepstakes entries and the customer has 100 available, the Reader server determines which five entries to reveal. The Reader server then sends the information on the five entries to the Reader and marks those five entries as revealed in the database.
 "31. Customer Tracking Terminal CCTT'). The CTT provides a mechanism for entering the customer's account data into the System and issuing a customer account card. Customers new to the CyberCenter must sign up and get an account card to begin tracking cybertime. The CTT interfaces with the Customer Tracking System.
 "32. Customer Tracking System CCTS'). The CTS provides an interface between the central database and the CTT. In addition to facilitating account creation and data entry, the CTS can be leveraged to facilitate promotions.
 "33. Recharge Kiosk. The recharge kiosks are automated stations that allow existing customers with account access cards to purchase additional cybertime and add it to their accounts. If customers have won cash prizes in the sweepstakes, they can use the Recharge Kiosks to [apply] those winnings towards additional cybertime purchases. *Page 608 
The Recharge Kiosks are connected to the Universal Point of Sale server.
 "34. Management Terminal. The management terminals allow users to monitor and control the system. They provide access to reports on how the System works and on the current state of the System. Management Terminals are personal computers running proprietary software that provides them with a means of requesting and displaying information from the Central Database. Customers who call in to determine the outcome of their sweepstakes entries will be serviced by employees of the CyberCenter through the Management Terminals. Management Terminals provide access to information from the database through their connection to the Management Terminal Service.
 "35. Management Terminal Service (`MTS'). The MTS connects the Management Terminals to the Central Database. The MTS packages requests for information from the Management Terminals and returns the data requested from the database. The MTS runs on a server in the back office of the CyberCenter."
(Emphasis added.)
In a nutshell, the MegaSweeps system functions as follows: A consumer wishing to play the readers opens an account by obtaining a magnetically encoded card, either by mail or at the point of sale at the race track. In either event, the account is simultaneously assigned, by the central database and a server, a number of MegaSweeps entries corresponding to the amount of cybertime the consumer obtained. The assignments are selected from any 1 of 20 pools containing 200 million entries in each pool. According to Clifton Lind, Multimedia's chief executive officer, the entries in each pool are "randomized by chance" before they are assigned to a consumer. The consumer activates one of the 1,300 readers by inserting his slide card into a slot on the reader. Once activated, the reader allows a consumer to reveal his entries. The consumer chooses an option and presses a button. Subsequently, the reader server reveals the selected number of entries. Whether those entries correspond to any of the winning entries that were assigned to the consumer's account at the point of sale is determined by a computer algorithm. The consumer may continue selecting options until all of his entries have been revealed.
When the consumer "logs off' the reader, his account status is maintained in the central database. The system will print out a report of the transaction, including the amount of winnings, if any. Subsequently, the consumer may collect his winnings at a "cash advance cage." In the alternative, he may exchange his winnings for more cybertime and, consequently, additional MegaSweeps entries, by inserting his card into one of the recharge kiosks and entering the amount of his winnings to be applied toward the purchase of more cybertime.
Barber contends that the "readers are slot machines with certain parts removed." Barber's brief, at 48 n. 12. Thus, he insists, the readers are illegal because they are "`readily adaptable or convertible' to slot machines" within the definition of §13A-12-20(10). Id.
In its order, the trial court concluded that the readers are not slot machines because the "readers are `dumb terminals,'" reasoning (1) that "no element of chance is present at thereaders," and (2) that "no consideration is paid or canbe paid to use the readers." (Emphasis added.) Barber, however, contends that both these elements are present if the components of the system are understood as working "collectively" and that "the trial *Page 609 
court erred in looking solely at the readers to determine whether gambling devices were present." Barber's brief, at 47 (emphasis added).
With a payout percentage of 92%, the owners do not — and could not — argue that the third element of gambling is absent in this case, that is, they do not contend that prizes are not being awarded. Instead, echoing the rationale of the trial court, Innovative insists that because the winning entries are predetermined within the centraldatabase at the moment the "player receives his card," prizes are not awarded on the basis of a "future contingent event," within the meaning of § 13A-12-20(4). Innovative's brief, at 66. Thus, this case turns on whether the MegaSweeps involves the elements of chance and consideration.
2. Chance
By "chance," we mean "a lack of control over events or the absence of `controllable causation' — `the opposite of intention.'" Opinion of the Justices No. 373,795 So.2d 630, 635 (2001) (quoting Black's Law Dictionary 231 (6th ed.1990)).
 "Slot machines have come a long way since Charles Fey invented the first nickel three-reeler in a small machine shop in San Francisco in 1895. . . . There are slot machines that have eliminated the handle, requiring only the pressing of a button to set the wheels spinning. Some slot machines don't even have slots; the number of times a player can pull the handle (or press the button) is displayed as replays in a window of the machine.
 "Charles Fey, if he were alive today, would recognize all of these machines as refinements of his invention."
I. Nelson Rose, Gambling and the Law 83 (Gambling Times, Inc. 1986) (emphasis added). Today, "most slot machines in casinos are not manually operated. . . ." Christine Hurt,Regulating Public Morals and Private Markets: OnlineSecurities Trading, Internet Gambling, and the SpeculationParadox, 86 B.U.L.Rev. 371, 428-29 (2006). More and more, such machines are controlled by computer. Id. at 441, nn. 382 383. Indeed, modern slot machines may be "stand-alone or network computers." Jeff Dense, TheSocioeconomic Impact of Gaming in the Virgin Islands, 8 Gaming L.Rev. 175, 176-77 (2004) (emphasis added). Thus, a device is no less a slot machine because it operates within anetwork, that is, because it shares computer-processing equipment with a number of similar devices.
In that connection, Innovative states:
 "By [constructing its system so that] winning and losing entries [would be determined] before the card is handed to the person and by not charging any consideration for the entries themselves, Innovative designed the [MegaSweeps] so that [the] required statutory elements] of `gambling device' — something staked `upon the outcome of a contest of chance or a future contingent event' — would be missing."
Innovative's brief, at 12 (emphasis added). However, Barber and certain amici curiae argue that when a consumer obtains his or her card with the assigned MegaSweeps entries, "chance occursat [that] point of sale." The Foundation's brief, at 7 (emphasis added). We agree.
It is axiomatic that one may not lawfully do indirectly what is unlawful to be done directly. It is uncontroverted that at least some of the readers had been adapted for such use from their former function as stand-alone, or mechanical, slot machines. The adaptation was described by Robert Sertell, Sheriff Hale's expert witness, in the following colloquy: *Page 610 
 "Q. Now, did you see any [of the] readers on [January 4, 2006, that were seized by the sheriff in December]?
 ". . . .
 "A. [By Sertell]. There was one, sir, yes, sir.
 "Q. Did you take it apart?
 "A. Yes.
 "Q. And what did you see in it that was anything of note?
 A. The cabinet had a Bally Manufacturing name plate on the side.[4] The internals of the cabinet had been removed and replaced with what was apparently a computer or a personal computer unit. There was provision inside for the bill-acceptor mechanism to be replaced if necessary. It was missing when I saw it. There was, indeed, the traditional cash box still in place. There was a ticket printer validator loaded still in place, that could have received and/or issued bar-coded tickets. That magazine was full. There was, I believe, a power supply in the cabinet and that is about it."
(Emphasis added.)
Significantly, the statutory definition of a slot machine includes any device that is "constructed or readilyadaptable or convertible to such use," regardless of whether it is "in working order or [whether] some mechanicalact of manipulation or repair is required to accomplish itsadaptation, conversion or workability." § 13A-12-20(10) (emphasis added). Just as the readers were adapted to function within the computerized MegaSweeps network, they could be retooled to operate as they were originally designed.
In this case, the element of chance is satisfied at the point of sale — before the readers are activated — by the same central database and other computer equipment that serve to operate the readers. It is immaterial that the readers do not, themselves, assign values to the entries. In short, the element of chance is as much a feature of the MegaSweeps network system as of a stand-alone slot machine.
3. Consideration
Barber contends that the trial court erred in holding that the element of consideration was absent in the operation of the MegaSweeps system. Arguing to the contrary, the owners first insist that the only consideration paid by consumers is not for MegaSweeps entries, but for cyber-time, which is sold at fair market value. The owners' argument, however, ignores the last sentence of § 13A-12-20(10): "Nor is it any less a slot machine because apart from its use or adaptability as such it may also sell or deliver something of value on abasis other than chance." (Emphasis added.)
This portion of the statute deals with the recurring attempts by gaming interests to invest slot machines with legitimacy as ordinary vending machines. See, e.g., Higdon v. McDuff,233 Ala. 497, 172 So. 636 (1937); Skates v. Hartsfield216 Ala. 618, 114 So. 10 (1927); Cagle v. State,18 Ala.App. 553, 93 So. 206 (1922) (machine yielding either chewing gum or nickels upon the deposit of a nickel was an illegal slot machine); and Painter v. State, 163 Tenn. 627, 45 S.W.2d 46 (1932). "Slot machines were invented that dispensed al *Page 611 
most worthless mints with every nickel played so the operator could say that the customer always received something for his money." Rose, Gambling and the Law 89. "The early courts were split on whether this converted the slot machine into a legitimate vending machine, until it was pointed out thatplayers continued to put in their nickels long after the mintshad run out." Id. (emphasis added). Consequently, the statute impels us to inquire beyond the fact that the consumer always receives something for his money. It requires us to consider the substance of the transaction, rather than its form.
Doing so accords with the general rule that "a slot machine which, in return for a coin deposited therein, dispenses merchandise represented to be of the value of such coin, accompanied at occasional and uncertain intervals by a varying amount of money . . ., or more broadly, one which provides an element of chance, is a gambling device." 38 Am.Jur.2dGambling § 104 (1999). Thus, "[w]here the return to the player is . . . dependent on an element of chance, a slot machine is a gambling device, even though the player isassured of his money's worth of some commodity and hence cannotlose." Id. (emphasis added). Such inquiry is also consistent with Ala. Code 1975, § 8-1-150 ("All contracts founded in whole or in part on a gambling consideration are void."), and with this Court's "`"`general disposition'"`" in the gambling context to "`"`regard always the substance and not the semblance of things, so as to prevent evasionsof the law.' "`" Ex parte Ted's Game Enters.,893 So.2d 376, 380 (Ala. 2004) (quoting Opinion of the JusticesNo. 373, 795 So.2d 630, 640 (Ala. 2001), quoting in turnOpinion of the Justices No. 277, 397 So.2d 546, 547
(Ala. 1981) (emphasis added in Opinion No. 373)).
To be sure, MegaSweeps "delivers something of value," namely, cybertime, on the basis of something "other than chance." Upon the tender of a minimum payment, consumers invariably receive four minutes of cybertime, in addition to 100 MegaSweeps entries. The owners contend that the consideration is paidfor the cybertime, and, consequently, that the MegaSweeps entries are free. This argument does not pass statutory muster, however, if, looking through the form of the operation to its substance, consumers are paying for theentries, in whole or in part, regardless of the cybertime acquired in conjunction with those entries. See §13A-12-20(10) ("[a]ny money or property" paid or received is consideration). In other words, if they are paying to play the readers, rather than to acquire, or in additionto acquiring, cybertime, the element of consideration set forth in § 13A-12-20(10) and (11) is satisfied.
The evidence on this issue was undisputed or uncontroverted. The trial court found that "few customers were using the [Internet kiosks]," but that customers "were lined up at all hours to use the readers." Also, the fact that the owners provided more than 11 times as many readers as Internet kiosks suggests an expectation that the readers would be the major attraction.
Indeed, consumers purchased additional cybertime — with the accompanying entries — even though they already had large quantities of unused cybertime on their accounts. The recharge kiosks, which allowed consumers to apply their "winnings toward additional cybertime purchases," facilitated those transactions. In fact, consumers who purchased cybertime were apprised only of the number of entries credited to their account, not the amount of cybertime, unless they used the recharge *Page 612 
kiosks or specifically asked MegaSweeps personnel about the cybertime.
The payout percentage is 92%. This percentage coincides with the industry standard for casino-style slot machines, which "typically pay back 90% to 98% of all money played, thus providing a hold for the house of 2% to 10%." Mark G. Tratos,Gaming on the Internet, 3 Stan. J.L. Bus. Fin. 101, 111 (1997). By contrast, the typical payout percentage for a "temporary promotional sweepstakes" is "one half of one percent." Midwestern Enters., Inc. v. Stenehjem,625 N.W.2d 234, 240 (N.D. 2001). Moreover, the duration of "promotional sweepstakes occasionally offered by fast food chains, or in connection with candy, sodas, miscellaneous food or other established retail products," is typically "limited," Tenn. Op. Att'y Gen. No. 02-089 n. 5 (August 21, 2002), as opposed to the duration of the MegaSweeps, which isindefinite. The payout percentage and duration of the operation are indicative of "the true purpose of the game."Stenehjem, 625 N.W.2d at 240.
Indeed, the trial court found it "obvious that most of the customers are more interested in getting [the] MegaSweeps entries than they are in using the [Internet kiosks]." The court further found that
 "the [owners] undertook [the MegaSweeps] to attract customers who wanted to gamble, or, at least, those who could be made to think that they were gambling. [The owners'] advertising through television commercials and billboards promoted playing [the] MegaSweeps as an alternative to attending gambling establishments at Greentrack, [Alabama,] or Philadelphia and Biloxi, Mississippi."
(Emphasis added.) These facts and findings refute the owners' argument that, because cybertime is sold at fair market value, the MegaSweeps operation falls outside the statutory definition of a slot machine. Clearly, a substantial number, if not the majority, of customers pay to play the readers, rather than to acquire, or in addition to acquiring, cybertime.
The owners next contend that there is no consideration for the entries, because minimum quantities may be obtained by mail or at the point of sale without charge. However, this Court has held that the availability of free chances is not necessarily dispositive of whether the game is a gambling scheme. Grimes v. State, 235 Ala. 192, 178 So. 73
(1937).
Grimes involved a "bank-night" scheme — common during the depression era, Roger J. Traynor, Quo Vadis,Prospective Overruling: A Question of JudicialResponsibility, 50 Hastings L.J. 771, 786 (1999) — in which, in order "[t]o promote business, theaters conducted drawings and made prizes available to patrons who bought tickets or, in some cases, to individuals who registered for the drawing but were not required to buy a ticket." Roland J. Santoni, An Introduction to Nebraska Gaming Law, 29 Creighton L.Rev. 1123, 1131 (1996) (emphasis added). Consistent with this practice, the operators of the Ritz Theater in Tuscaloosa held a drawing each Thursday night for a cash prize.Grimes v. State, 28 Ala.App. 4, 178 So. 69 (1937) (setting forth the underlying facts). "A registration booth was maintained during all hours of each day of the week in the marquee of the theater, where registration cards could be signed" by individuals wishing to participate in the drawing.28 Ala.App. at 5, 178 So. at 69. Stubs of all such cards were placed in a "hopper" and made up the pot from which each drawing was taken. 28 Ala.App. at 6, 178 So. at 70. "[N]o charge ofany kind was made or any consideration exacted from any one, andthe signing of such card was absolutely free, no one being *Page 613 required to purchase a ticket of admission to register."28 Ala.App. at 5, 178 So. at 69 (emphasis added).
 "In addition to the original registration card, [however,] those patrons of the theater who attended a [matinee] performance of the theater prior to the hour of the drawing on the day of the drawing, viz., Thursday of each week, were permitted, if they so desired, to sign an additional card [`the matinee card'] other than the registration card. . . ."
28 Ala.App. at 6, 178 So. at 70 (emphasis added). Prizes were awarded only to persons who had signed the matinee card, unless the person whose name was drawn was present on the premises and stepped forward within two minutes to claim his prize. 28 Ala.App. at 6, 178 So. at 70.
Cecil B. Grimes, as "city manager of the . . . [Tuscaloosa] theaters," was "convicted of conducting a lottery."28 Ala.App. at 5, 178 So. at 69. The Court of Appeals affirmed the conviction, and Grimes sought certiorari review, which this Court denied with a written opinion. 235 Ala. at 192,178 So. at 73.
The only issue presented to this Court was whether the element of consideration was satisfied, where "everybody [could] register, and [could] participate in the drawing by being either in the theater, or on the outside, in position to appear and claim the prize within two minutes." 235 Ala. at 193,178 So. at 74. The Court inquired: "How can it be said patrons . . . have paid anything for a chance, if they have a like chance without paying?" Id.
Holding that the element was satisfied, however, the Court focused on the recipient of the consideration, that is, "[was] there a consideration moving to him?"235 Ala. at 193, 178 So. at 74. Thus, the Court reasoned that "the lure of bank night [was] the show, and the chance for a prize, as against the chance without the show."235 Ala. at 193-94, 178 So. at 74 (emphasis added). "[L]ooking through form and dealing with reality," the Court recognized that "the plan [was] intended to fill the theater, not the lobby outside," and that "the success of the plan in swelling the patronage, and consequent income through the scheme of chance [was] the final proof of a consideration paid and a consideration received." 235 Ala. at 194, 178 So. at 74.
Finally, the Court stated:
 "That the prize may go to some one who has paid nothing does not negative the fact that many have paid for their chance. Because some have not been drawn into the gambling phase does not render it any the less a lottery, with whatever of evil it engenders, as to the large public who have paid."
235 Ala. at 194, 178 So. at 74 (emphasis added). Grimes
thus stands for the proposition that the opportunity for free plays does not a negate the element of consideration, or obviate an inquiry into the purpose and effect of the operation as "the final proof of . . . consideration." See also Clark v.State, 262 Ala. 462, 462, 80 So.2d 312, 312 (1955) (the purpose and effect of the operation is a factor in deciding whether "consideration [is] moving to the operator").
In support of their argument that the opportunity for free plays negates the element of consideration, the owners cite PepsiCola Bottling Co. of Luverne v. Coca-Cola Bottling Co.,534 So.2d 295 (Ala. 1988) ("Pepsi Cola"), a short, per curiam opinion holding that an `"Instant Cash' promotion," operated by Pepsi Cola Bottling Co. of Luverne, Inc. ("Pepsi"), did not constitute a lottery. 534 So.2d at 296. The promotion "offered a prize of $10,000 to someone presenting [bottle] caps containing all the letters" spelling "`Pepsi Instant *Page 614 
Cash.'" Id. "For [that] campaign, Pepsi distributed 25,000 cards with a similar opportunity at participating stores and advertised via store displays and radio that no purchase was required to participate in the game. Cards could also be obtained by telephone request and by writing the bottling plant or production center in Columbus, Georgia." 534 So.2d at 296. In holding as it did, the Court did not discuss, overrule, or attempt to distinguish Grimes. It merely stated that "the `Pepsi Instant Cash' game [was] not a lottery, because participants were not required to purchase cards in order to play." 534 So.2d at 297.
We need not decide whether Pepsi Cola conflicts withGrimes, because it is distinguishable fromthis case in at least two important respects. First, unlike the sweepstakes in Pepsi Cola, MegaSweeps is a permanent, high-stakes game. "[I]t does not follow that simply because low-stakes, temporary promotional sweepstakes with pay-out rates of one-half of one percent that offer free play are not pursued as lotteries, we must conclude high-stakes, permanent games with pay-out rates of [ninety-two] percent are immune from the definition of [gambling]. . . ." MidwesternEnters., Inc. v. Stenehjem, 625 N.W.2d at 240 ("Lucky Strike" machine, which dispensed a "two-minute pre-paid phone card" in addition to a "game piece giving the buyer a chance to win up to $500 in cash," having a payout percentage of 65%, was an illegal gambling device, despite a limited opportunity to play the machine for free). Second — and more fundamentally — Pepsi Cola, unlike this case, did not involve the use of an alleged gambling device. The facts in Pepsi Cola did not require, or invite, an analysis of § 13A-12-27 and § 13A-12-20(10) and (11). In particular, there was no allegation, like the one here, that the game involved the use of a slot machine. Thus, PepsiCola is inapposite.
We think "Charles Fey, [inventor of the slot machine,] if he were alive today, would recognize [the accessorized MegaSweeps readers] as refinements of his invention." Rose, at 83. Innovative conceded that it constructed its system "so that [the] required statutory element[s] of [a] `gambling device' — something staked `upon the outcome of a contest of chance or a future contingent event' — would bemissing." Innovative's brief, at 12 (emphasis added). The flaw in Innovative's approach is that the elements are not "missing" from the mechanics of the scheme. They are simplydispersed throughout the various units and processes of the integrated network.
The owners propose that they have found, and exploited, a "loophole" in the law. Indeed, the trial court stated:
 "The evidence convinces the court that through careful planning the [owners] have found a loophole in the patchwork of Alabama's anti-gambling laws and they have taken advantage of that loophole. In the words of the Sheriffs expert witness, Robert Sertell, the [owners'] sweepstakes promotion was `trying to pull a tractor-trailer through a loophole.' This court agrees that the [owners] have taken advantage of weaknesses in the law. . . ."
(Emphasis added.) Alabama's gambling law, however, is not so easily evaded. It is "`the policy of the constitution and laws of Alabama [to prohibit] the vicious system of lottery schemes and the evil practice of gaming, in all their protean shapes."'Opinion of the Justices No. 83, 249 Ala. 516, 517,31 So.2d 753, 754 (1947) (quoting Johnson v. State, 83 Ala. 65,67, 3 So. 790, 791 (1887) (emphasis added)). In the computer age, the fact that chance takes place at the point of sale rather than at the readers themselves is simply inconsequential. *Page 615 
Thus, the readers are slot machines as to those who pay toplay them. Are they any less so because a few patrons play for free? We think not. "Because some have not been drawn into the gambling phase does not render it any the less [a slot machine], with whatever of evil it engenders, as to the large public who have paid." Grimes,235 Ala. at 194, 178 So. at 74 (emphasis added). Gratuitous entries obtained by mail or at the race track do not legitimize the high-stakes MegaSweeps any more than some opportunity for free plays could render innocuous a conventional slot machine. The trial court's contrary holding was, therefore, error.[5]
 C. Vagueness
The JCRA challenges the statutory definition of gambling as unconstitutional as applied to this particular case. Because the trial court held in favor of the owners on their substantive claims, it did not address the JCRA's constitutional arguments. More specifically, the trial court stated:
 "The [owners] have . . . argued that the relevant statutes, Ala. Code (1975) Section 13A-12-20 et seq., are unconstitutional as applied to this case because of vagueness. . . . The argument may have merit, but because of the conclusion reached by the court that the plaintiffs' promotional scheme is lawful, the constitutional issue need not be addressed."
Because we disagree with the trial court as to the legality of the MegaSweeps operation, the constitutional issue is squarely before us, and we address JCRA's vagueness challenge.
"In reviewing the constitutionality of a statute, we `approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government.'" Moorev. Mobile Infirmary Ass'n, 592 So.2d 156, 159 (1991) (quoting Alabama State Fed'n of Labor v. McAdory,246 Ala. 1, 9, 18 So.2d 810, 815 (1944)). Overcoming that presumption is a heavy burden, which is borne by the party challenging the validity of the statute. Densmore v.Jefferson County, 813 So.2d 844, 856 (Ala. 2001);Jefferson County Bd. of Health v. City of Bessemer,293 Ala. 237, 301 So.2d 551 (1974).
The JCRA specifically challenges only § 13A-12-20(4), which provides, in pertinent part:
 "A person engages in gambling if he stakes or risks something of value [consideration] upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he or someone else will receive something of value in the event of a certain outcome."
(Emphasis added.) The essence of the JCRA's argument, as we understand it, is that if this Court holds that the elements ofchance and consideration are present in the MegaSweeps system, those terms are unconstitutionally vague. We disagree.
"Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." City ofChicago v. Morales, 527 U.S. 41, 56, 119 S.Ct. 1849,144 L.Ed.2d 67 (1999). However, "`[m]ere difficulty of ascertaining its meaning or the *Page 616 
fact that it is susceptible of different interpretations will not render a statute . . . too vague or uncertain to be enforced.'"Scott Scott, Inc. v. City of Mountain Brook,844 So.2d 577, 589 (Ala. 2002) (quoting City of Birmingham v.Samford, 274 Ala. 367, 372, 149 So.2d 271, 275 (1963)). "[F]ew words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions." Boyce MotorLines, Inc. v. United States, 342 U.S. 337, 340,72 S.Ct. 329, 96 L.Ed. 367 (1952). "Consequently, no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close toan area of proscribed conduct shall take the risk that he maycross the line." Id. (footnote omitted; emphasis added).
Moreover, "[a] statute is not vague when the meaning of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves, if they possess acommon and generally accepted meaning." Bowers v.State, 283 Md. 115, 125, 389 A.2d 341, 347 (1978) (emphasis added).
The JCRA does not allege that the meanings of the words "chance" and "consideration" are mysterious or new. Actually, "[g]ambling is as old as man, and certainly as old as the common law." Rose, at 75. The elements of gambling under § 13A-12-20(4) are the same as those at common law, namely, the payment of (1) consideration, for the (2) chance to win (3) a prize. SeeGrimes v. State, 235 Ala. at 193, 178 So. at 74; Kyle D. Craddock, The Cardstock Chase, Trading Cards: A LegalLottery? 8 Gaming L.Rev. 310, 314 (2004) (the "three basic [common-law] elements of gambling [are] consideration, chance, and prize"). Thus, the meanings of the words "chance" and "consideration" are easily apprehended by reference to "judicial determinations [and] the common law," at which they "possess a common and generally accepted meaning." Bowers v.State, 283 Md. at 125, 389 A.2d at 347. Moreover, the element of consideration in the specific context of this case is meticulously defined in § 13A-12-20(11).
In that connection, the amicus curiae brief filed by the Attorney General contends that there is no "vagueness," and "no confusion about what the law requires," the only issue being one of fact, that is, how the MegaSweeps functions. Brief of Attorney General, at 10. Indeed, this case turns not so much on the definitions of "chance" and "consideration" as on their applications to the undisputed facts.
In the final analysis, Innovative created a system composed of what were formerly slot machines, which look like, sound like, and attract the same class of customers as conventional slot machines, and, when integrated with the servers, serve essentially the same function as did the slot machines. In a carefully planned venture, Innovative transferred the element of chance from the readers to a server, merged the MegaSweeps entries with cybertime, and staked the success of its venture on the legal efficacy of the transfer and merger. The owners have identified neither statutory law nor caselaw suggesting that such displacement and merger are legally significant. Having "take[n] the risk that" their venture "may cross the line," it is not "unfair to require" that the owners bear the consequences of failure. Consequently, the JCRA has not demonstrated that the statutory scheme is unconstitutional.
 III. Case No. 1050625
Our resolution of the issues in case no. 1050857 necessarily resolves the issues in *Page 617 
case no. 1050625. Therefore, the appeal in case no. 1050625 is dismissed as moot.
 IV. Summary
In summary, the trial court erred in focusing on the function of the MegaSweeps readers in isolation. When integrated as they are with the servers, central database, and related computer equipment, the readers are slot machines as that term is defined by § 13A-12-20(10) and § 13A-12-27. Moreover, §13A-12-20 is not unconstitutionally vague. For these reasons, the judgment in favor of the owners is reversed and a judgment is rendered in favor of Barber.
1050625 — APPEAL DISMISSED.
1050857 — REVERSED AND JUDGMENT RENDERED.
SEE, LYONS, HARWOOD, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
STUART, SMITH, and BOLIN, JJ., file statements of nonrecusal.
STUART, Justice (statement of nonrecusal).
Jefferson County Racing Association, Inc., d/b/a the Birmingham Race Course (hereinafter referred to as "JCRA"), has moved for my recusal in these appeals. In its motion the JCRA alleges:
 "1. Justice Stuart is currently engaged in a political campaign for reelection to the office of Justice of the Alabama Supreme Court.
 "2. Justice Stuart has publically indicated that she opposes the `establishment of gambling.' The recently released Christian Action Alabama 2006 General Election Voter Guide reflects that Justice Stuart `agrees' on the issue of `oppose establishment of gambling'. . . .
 ". . . .
 "6. Justice Stuart has taken a political and ethical posture against gambling, has made her views public and has made her anti-gambling position a basis of why she should be re-elected a Justice of the Alabama Supreme Court. This stance is indicative of a bias that could squarely impact the parties, interests, and issues in these appeals.
 "7. . . . [T]he core issue of the above-referenced cases concerns whether certain . . . business activities constitute unlawful gambling or a lawful sweepstakes operation.
 ". . . .
 "13. A judge or justice must be a neutral decision maker and not an advocate. The issue presented by this motion is not about political speech. It is about a stated and demonstrated actual bias and prejudice to a participant and an issue in a legal case before this Court.
 ". . . .
 "Therefore, it is clear that the Canons of Judicial Ethics mandate that a justice cannot sit on a case involving the issue of whether certain activities constitute unlawful gambling or a lawful sweepstakes operation when one of her political campaign platforms is against gambling. Justice Stuart must disqualify/recuse herself from the above-styled cases."
Innovative Sweepstakes Systems, Inc., has also moved for my recusal in these appeals on the same grounds.
Canon 3.C., Ala. Canons of Jud. Ethics, provides:
 "(1) A judge should disqualify [her] self in a proceeding in which [her] disqualification is required by law or [her] impartiality might reasonably be questioned, including but not limited to instances where: *Page 618 
 "(a) [She] has a personal bias or prejudice concerning a party. . . ."
Judges are required to make decisions based on the application of the law to the facts, despite their personal opinions.
 "A judge's views on matters of law and policy ordinarily are not legitimate grounds for recusal, even if such views are strongly held. See
Richard E. Flamm, Judicial Disqualification: Recusal and Disqualification of Judges § 10.2 (1996) (collecting cases). After all, judges commonly come to a case with personal views on the underlying subject matter. . . . Far from necessarily warranting recusal, typically such views merely mark an active mind. See Laird v. Tatum, 409 U.S. 824, 835, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972) (`Proof that a [judge's] mind . . . was a complete tabula rasa . . . would be evidence of lack of qualification, not lack of bias.'); John Leubsdorf, Theories of Judging and Judge Disqualification, 62 N.Y.U. L.Rev. 237, 250-51 (1987) (discussing Judge Jerome Frank's statement that `[i]f . . . bias and partiality be defined to mean the total absence of preconceptions in the mind of the judge, then no one has ever had a fair trial and no one ever will')."
United States v. Snyder, 235 F.3d 42, 48 (1st Cir.2000).
I have personal opinions about many issues. As a trial court judge I made, and as a Supreme Court Justice I now make, my decision in a case based on the application of the law to the facts in that particular case, regardless of my personal opinion. I have always done so, and I will continue to do so.
Because my personal opinions do not influence my decisions as a Justice of this Court, I decline to recuse myself.
SMITH, J., concurs.
SMITH, Justice (statement of nonrecusal).
Jefferson County Racing Association, Inc., d/b/a the Birmingham Race Course, and Innovative Sweepstakes Systems, Inc., have filed motions seeking my recusal in these consolidated appeals. For the reasons expressed by Justice Stuart and by Justice Bolin in their statements of nonrecusal, I also decline to recuse myself.
I write separately to emphasize that I have a constitutional duty to decide cases, and that duty is balanced with the requirement of impartiality.
 "The Constitution of the United States and the Constitution of Alabama of 1901 impose on judges the duty to decide cases. See U.S. Const. art. Ill, § 1 (vesting the `judicial Power of the United States . . . in one supreme court, and in such inferior courts as the Congress may from time to time ordain and establish'); id. at art. VI (`[A]ll . . . judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution. . . .'); Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 218-19, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (`Article III establishes a "judicial department" with the "province and duty ". . . to decide . . ." case[s]."') (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) (emphasis added)); Marbury, 5 U.S. at 180 (stating that a judge's oath to support the Constitution requires that he exercise the judicial power and decide cases in a manner consistent with fundamental law); Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (`It is a judge's duty to decide all cases within his jurisdiction. . . .'); Ala. Const. 1901 amend. 328, § 6.01(a) (`[T]he judicial power of the state shall be vested *Page 619 
exclusively in a unified judicial system which shall consist of a supreme court. . . .'); id. at § 279 (requiring `all officers, executive and judicial, . . . [to] take the following oath or affirmation: "I, ____, solemnly swear . . . that I will support the Constitution of the United States, and the Constitution of the State of Alabama . . . and that I will faithfully and honestly discharge the duties of the office upon which I am about to enter"'); Federated Guaranty Life Ins. Co. v. Bragg, 393 So.2d 1386, 1389 (Ala. 1981) (`"[I]t is the duty of the judge to adjudicate the decisive issues involved in the controversy . . . and to make binding declarations concerning such issues, thus putting the controversy to rest. . . ."') (citation omitted)."
Dunlop Tire Corp. v. Allen, 725 So.2d 960, 976
(Ala. 1998) (See, J., statement of nonrecusal). STUART, J., concurs.
BOLIN, Justice (statement of nonrecusal).
Innovative Sweepstakes Systems, Inc., and the Jefferson County Racing Association, Inc., have each filed a motion seeking my recusal in these appeals because a Christian Coalition voter guide for the 2004 election indicated my agreement with the Christian Coalition on the issue of gambling, in that I was shown as agreeing next to the phrase "oppose establishment of gambling."
In Republican Party of Minnesota v. White,536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002), the United States Supreme Court addressed the issue whether a judicial candidate'sFirst Amendment rights were violated by a canon of the Minnesota Code of Judicial Conduct that prohibited him from announcing his views on disputed legal or political issues. The Supreme Court held that this prohibition, known as the "announce clause," did violate the First Amendment rights of judicial candidates.
Thus, the United States Supreme Court has ruled that a judicial candidate's First Amendment rights permit the candidate either to announce or discuss or to refuse to announce or discuss personal views on an issue such as gambling. Each individual candidate is therefore constitutionally permitted to express his or her views in a manner that allows those views to be disseminated to the citizenry — in this case, answers in response to specific questions on a questionnaire.
White teaches that judicial candidates may respond to questions such as those that were asked in the 2004 Christian Coalition voter guide. I note that the Alabama Judicial Inquiry Commission, following the United States Supreme Court's release of White, withdrew an advisory opinion in which it had opined that a judicial candidate would be violating the Alabama Canons of Judicial Ethics if the candidate answered certain questions on a questionnaire issued by the Christian Coalition in anticipation of the 2000 elections. See ChristianCoalition of Alabama v. Cole, 355 F.3d 1288 (11th Cir.2004). The withdrawal of this advisory opinion was in keeping with White and reflected the Judicial Inquiry Commission's view that answers to questions such as those in the Christian Coalition questionnaire were permissible free speech.
The question then arises as to whether answering such questions would violate Canon 3.C.(1), Ala. Canons of Jud. Ethics, which provides:
 "(1) A judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned, including but not limited to instances where: *Page 620 
 "(a) He has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding. . . ."
In this proceeding, I have no knowledge whatsoever of any disputed evidentiary facts not disclosed in the record nor any bias or prejudice either for or against any party, and there were no allegations in the recusal motion that I had such knowledge or bias. The only remaining issue is whether there is anything else by which my "impartiality might reasonably be questioned."
All judges are presumed to be qualified and unbiased. Garyv. Crouch, 867 So.2d 310 (Ala. 2003). The burden of proof is on the party making a motion to disqualify or recuse to establish that the judge whose disqualification or recusal is sought is biased or prejudiced against a party. Ex parteMonsanto Co., 862 So.2d 595 (Ala. 2003). In 2004, I expressed the view that I "oppose the establishment of gambling." My position on that issue is consistent with the law of Alabama; gambling is illegal in this State. I also oppose other acts that violate the laws of the State of Alabama, such as murder, rape, and robbery, but my personal opposition to the above acts does not prevent me from fairly and unbiasedly participating in cases involving such acts. The main opinion in this case strictly applies the law as it exists in the State of Alabama to the facts that are before the Court. The opinion contains no bias or prejudice in favor of or against gambling, and I brought no bias or prejudice to my participation in it. Furthermore, the movants' position in the present case is that their activities do not constitute gambling but instead constitute a promotional sweepstakes. Therefore, there is an inherent inconsistency in the movants' argument that I should recuse myself from this case because I have indicated an opposition to the legal establishment of gambling and their argument on appeal that their enterprise is not gambling at all.
After due consideration, I decline to recuse myself.
STUART and SMITH, JJ., concur.
[1] A "gambling device" is defined as "[a]ny device, machine, paraphernalia or equipment that is normally used or usable in the playing phases of any gambling activity, whether that activity consists of gambling between persons or gambling by a person involving the playing of a machine." Ala. Code 1975, §13A-12-20(5).
[2] Direct quotations in Part II.B.1. of this opinion are from the stipulation unless otherwise noted.
[3] According to Multimedia's chief executive officer, the system used at the race course is the "most sophisticated" system in operation.
[4] Bally Manufacturing Company "is one of the oldest names in gaming, and was the dominant manufacturer of slot machines until [International Gaming Technology] took over that role in the 1980s." John Grochowski, The Slot Machine Answer Book: HowThey Work, How They've Changed and How to Overcome the HouseAdvantage 68 (Bonus Books 2d ed. 2005).
[5] Our conclusion that the accessorized readers are slot machines renders unnecessary any discussion of whether they are also a lottery.